502 F.2d 249
 NATIONAL ASSOCIATION OF INDEPENDENT TELEVISION PRODUCERS AND
DISTRIBUTORS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
WESTINGHOUSE BROADCASTING COMPANY, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
WARNER BROS., INC., and Columbia Pictures Industries, Inc.,
Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
American Broadcasting Companies, Inc., et al., Intervenors.
 Nos. 1026, 1027 and 1047, Dockets 74-1168, 74-1283 and 74-1348.
 United States Court of Appeals, Second Circuit.
 Argued April 5, 1974.
Decided June 18, 1974.
 
 Katrina Renouf, Washington, D.C. (Margot Polivy, Edward J. Kuhlmann, and Renouf, McKenna & Polivy, Washington, D.C., on the brief), for petitioner National Association of Independent Television Producers and Distributors.
 John D. Lane, Washington, D.C. (J. Carter McKaig, Ramsey L. Woodworth, and Hedrick & Lane, Washington, D.C., on the brief), for petitioner Westinghouse Broadcasting Co., Inc.
 Stuart Robinowitz, New York City (Theodore C. Sorenson, George P. Felleman, Donald E. Brown, and Paul, Weiss, Rifkind, Wharton & Garrison, Jerome S. Boros and Fly, Shuebruk, Blume & Gaguine, New York City, on the brief), for petitioners Warner Bros., Inc. and Columbia Pictures Industries, Inc. and intervenors National Committee of Independent Television Producers and Samuel Goldwyn Productions.
 Ronald S. Konecky, New York City (Hardee, Barovick, Konecky & Braun, New York City, Peter Bierstedt and Pierson, Ball & Dowd, Washington, D. Co., on the brief), for intervenor Time-Life Films, Inc.
 Arthur Scheiner, Washington, D.C. (Robert D. Hadl and Wilner & Scheiner, Washington, D.C., on the brief), for intervenor MCA, Inc.
 Kenneth A. Cox, Washington, D.C., for Sandy Frank Co. as amicus curiae.
 Thomas N. Frohock, Washington, D.C. (James A. McKenna, Jr. and McKenna, Wilkinson & Kittner, Washington, D.C., on the brief), for intervenor American Broadcasting Companies, Inc.
 J. Roger Wollenberg, Timothy B. Dyk, Sally Katzen, and Wilmer, Cutler & Pickering, Washington, D.C. and Eleanor S. Applewhaite, New York City, on the brief, for intervenor Columbia Broadcasting System, Inc.
 Joseph A. Marino, Associate Gen. Counsel, Federal Communications Commission (Daniel R. Ohlbaum, Acting Gen. Counsel, Daniel M. Armstrong and Philip V. Permut, Counsel, Federal Communications Commission, Washington, D.C., on the brief), for respondents Federal Communications Commission and United States of America.
 Thomas E. Kauper, Asst. Atty. Gen., and Howard E. Shapiro, Atty., Dept. of Justice, Washington, D.C., on the brief, for United States of America.
 Before HAYS, and OAKES, Circuit Judges, and CHRISTENSEN, District judge.*
 HAYS, Circuit Judge:
 
 
 1
 This action comes to us on petitions to review an order of the Federal Communications Commission which amended the Prime Time Access Rule (PTAR). 47 C.F.R. 73.658(k) (1973). We hold that the Commission failed to allow adequate time for the amendments to become effective. We enjoin the Commission from making the amendments effective before September 1975. Otherwise we dismiss the petitions without prejudice to their renewal after the Commission has had an opportunity to conduct any further proceedings it may deem desirable.
 
 I.
 
 2
 In May 1970 the FCC, after lengthy preliminary studies and extensive hearings, enacted the Prime Time Access Rule. 23 F.C.C.2d 382, 401-02, modified on reconsideration, 25 F.C.C.2d 318, 336-37.[1] Simply stated, the rule prohibited television stations in the fifty largest metropolitan areas from broadcasting network programs in more than three of the four evening hours in which most people watch television ('prime time'). To assure that the remaining hour ('access time') would be available for independently created programs, the rule prohibited the showing of feature films recently televised within the market or 'off-network' programs (previous network programs, or 're-runs') during access time.[2]
 
 
 3
 The FCC enacted the rule to combat the stranglehold the three major networks had acquired over prime time programing. The three networks had acquired virtually exclusive power to determine what millions of television viewers could watch every evening. The Commission found that 'the public interest requires limitation on network control and an increase in the opportunity for development of truly independent sources of prime time programing.' 23 F.C.C.2d at 394.
 
 
 4
 On petitions for review we held that PTAR and the financial interest and syndication rules neither exceeded the Commission's statutory authority nor violated the First Amendment. Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 477 (2d Cir. 1971). On the constitutional issue we held that the rule, 'far from violating the First Amendment, appears to be a reasonable step toward fulfillment of its fundamental precepts . . ..' Id. at 477. However, we recognized the experimental nature of the rule and warned that our holding did not preclude a further review of experience with the rule if it proved to be inimical to the public interest. Id. at 479.
 
 
 5
 The FCC from the start also conceded the experimental nature of the rule and declared its intent to review its effects from time to time. 23 F.C.C.2d at 401. On October 30, 1972, the Commission issued a Notice of Inquiry and Notice of Proposed Rule Making, 37 F.C.C.2d 900, in which it announced its intention to consider modifications in or repeal of the rule. More than forty parties filed comments with the Commission. On July 30 and 31, 1973, the FCC conducted oral hearings. On November 29, 1973, the Commission announced that it had decided on certain changes in the rule. These were formally adopted in a Report and Order dated February 6, 1974 (hereinafter referred to as 'Report'). 44 F.C.C.2d (1974). The petitions now before us attack the modifications of the rule ordered by the Commission.
 
 
 6
 The Commission modified the rule in several ways.[3] First, it eliminated access time altogether on Sunday evenings, reduced access time to one half-hour other evenings, and pegged access time to a particular time slot (7:30-8 P.M. in the Eastern and Pacific Time Zones, 6:30-7 P.M. in the Central and Mountain Zones). Second, the Commission provided that a station might devote one half-hour of access time each week to certain types of network programing (children's specials or documentary or public affairs programs). Third, the Commission made certain adjustments for time zone differences and sports 'runovers' and sports associated programs. Fourth, the Commission completely barred feature films from access time.[4]
 
 
 7
 Two groups of petitioners have attacked the revised rule.[5] The first group, which we shall identify with the National Association of Independent Television Producers and Distributors (NAITPD), seeks a return to the original PTAR. This group contends that the Commission did not give the rule an adequate test period and that the modifications of the rule subvert the purposes behind the original rule, increase network dominance, and impose unconstitutional restraints on speech.[6] The group further argues that the effective date of the modifications in unreasonable.
 
 
 8
 A second group, which we shall identify with Warner Bros., Inc., seeks total repeal of the rule.[7] The group maintains that experience with PTAR shows that it has increased network dominance and has failed to improve grogram diversity. The group argues further that the ban on feature films and off-network programs in access time is contrary to the public interest and violates the First Amendment.
 
 
 9
 In view of our disposition of the case we need not consider the merits of either of the attacks on the revised rule or the FCC's justifications for its action.
 
 II.
 
 10
 NAITPD and Time-Life Films have attacked the effective date of the new rule as unreasonable because it does not give independents who have produced programs for access time in reliance on the rule sufficient opportunity to withdraw from these ventures without unnecessary expense. We agree.
 
 
 11
 The FCC first mentioned the September 1974 effective date in its informal report of January 24, 1974. The Commission formally adopted that effective date in its Report and Order of February 6, 1974. Thus the parties will have had notice of the effective date for only eight months or less.
 
 
 12
 The FCC claims that the effective date is unassailable because it complies with section 4(c) of the Administrative Procedure Act, 5 U.S.C. 553(d) (1970), which provides that a regulation may be made effective 'not less than 30 days' after publication. As the language of the statute indicates, this provision merely establishes a minimum period of notice. It does not authorize the use of an effective date that is arbitrary or unreasonable. Cf. 5 U.S.C. 706(2)(A) (1970).
 
 
 13
 In its Report the Commission noted that Warner Bros. and MCA had urged that immediate repeal of PTAR was feasible, while others had proposed a notice period much longer than eight months. Report PP75, 76, 44 F.C.C.2d at . The Commission decided to make the changes effective in September 1974. Id. P113, 44 F.C.C.2d at . The Commission based this decision on a finding that 'the public interest is served by making improvements in any rule effective at a reasonably early date' and that a lengthy lead time was unnecessary 'in view of the limited expansion of network programing which we have decided to permit.' Id. 44 F.C.C.2d at .
 
 
 14
 In promulgating the original rule the Commission allowed a much longer grace period. The Commission permitted the networks sixteen months to phase out their domestic syndication and foreign distribution activities. 23 F.C.C.2d at 399. This enabled the networks to dispose of their inventories of re-runs without incurring larger losses. The Commission also allowed sixteen months before making PTAR effective. Id. On reconsideration of its original order the Commission postponed for a further year the prohibition on off-network programs and feature films 'to permit ample time for changeover.' 25 F.C.C.2d at 334-35.
 
 
 15
 The Commission has not shown that the public interest in making rule changes effective 'at a reasonably early date' and the need for lead time are any different in this proceeding than they were in promulgating the original rule.
 
 
 16
 The evidence before the Commission strongly indicated that a longer lead time would be desirable. First, by reducing access time from fourteen to six or fewer half-hours per week the Commission sharply restricted the market for programs produced by independents for access time. Even if the Commission's claim that the modifications are not great is correct with respect to the networks, the modifications have a very great impact on the independents producing for access time. This is especially true for one hour shows planned for access time. Ti may prove very difficult to market these shows at all. The longer grace period permitted the networks to cushion the adverse impact of the original rule should also have been granted the independents in this case.
 
 
 17
 The networks themselves (including NBC and CBS, both of which advocate total repeal of the rule) testified that program planning begins twelve to eighteen months before the start of the season and that a shorter lead time would produce lower quality network programming. This directly contradicts the Commission's claim that a shorter time would be in the public interest. We note also that the uncertain status of the revised rule pending this appeal may well have further delayed network planning, thereby further reducing the possibility that quality network programming will be ready by September 1974.
 
 
 18
 The position of Warner Bros. and MCA concerning the effective date of the amended rule must be viewed in the light of their position as to what substantive changes should have been made. They demanded total repeal of PTAR, and of the ban of feature films in particular, on the ground that it was inimical to the public interest. The Commission rejected that argument and indeed strengthened the ban on feature films. Having rejected the substantive proposals, the FCC can hardly give great weight to views of Warner Bros. and MCA on when the modifications adopted by the Commission should become effective.[8]
 
 
 19
 Thus virtually all the relevant testimony recommended a longer grace period than the Commission allowed.
 
 
 20
 The Commission contends that a rule is not invalid merely because it has retroactive consequences or modifies preexisting interests. The Commission relies primarily on General Telephone Co. v. United States, 449 F.2d 846, 863-864 (5th Cir. 1971). But the court in General Telephone found that petitioners there should not have relied on the Commission's acquiescence in their activities because the Commission had for many years hinted that it might curtail those activities. Id. In the present case petitioners had good reason to rely on their status under the rule. The FCC did not merely acquiesce in petitioners' activities, it invited and encouraged them. Part of the avowed purpose of PTAR was to urge independents to produce programs for prime time and to foster a healthy syndication industry.[9] Notice of intent partially to reverse this policy came only eight months before the effective date. Having justifiably relied on the Commission's prior policy, petitioners are entitled to more opportunity to adjust to the new rule.
 
 
 21
 The court in General Telephone made it clear that a rule with retroactive consequences must be reasonable.[10] Any implication by the FCC that this court may not consider the reasonableness of the retroactive effect of a rule is clearly wrong.[11]
 
 
 22
 We conclude that any effective date earlier than September 1975 would be unreasonable because it would cause serious economic harm to independent producers and because it gives networks inadequate time to plan additional programming. We remand the case to permit the Commission to specify precisely what the effective date should be.
 
 III.
 
 23
 In view of our disposition of the foregoing issue we have decided to postpone consideration of the merits of the petitions before us. The Commission may choose to utilize the additional time available to it to reconsider its changes in the rule. Further experience with the original rule may aid its deliberations and our own. We therefore dismiss the petitions without prejudice to their being renewed after the Commission has had an opportunity to conduct any further proceedings it deems desirable.
 
 
 24
 While we refrain from directing the Commission to hold further hearings or to determine the character of those hearings if they are held, we call the Commission's attention to certain policy issues raised by the petitions.
 
 A. Economic Factors
 
 25
 The FCC originally justified PTAR, and we upheld it, as a means to weaken network domination of prime time television. The Warner Bros. petitioners have argued that PTAR has not accomplished this goal and indeed has increased network dominance. They claim that by shrinking network prime time to three hours per night the rule has created an 'artificial scarcity' of network prime time and thereby increased the networks' leverage in that time over independent producers, stations, and advertisers.
 
 
 26
 In making these arguments petitioners rely heavily on the report of Alan Pearce, the FCC's communications economist.[12] At the outset this report states its major conclusion in dramatically blunt fashion: 'Overall network power has been strengthened, not weakened, by the prime-time access rule.' Economist's Report 1.
 
 
 27
 The Commission rejected the arguments of the Warner Bros. petitioners and of its economists as 'speculative.'[13] Of course, the findings of the economist are not binding on the Commission or on this court. Other economists also expressed views on the matter. See Report, Appendix D, 44 F.C.C.2d at . The Commission might accept an opposing view or formulate its own conclusions, so long as it fully explains its reasons for so doing. Our task on review is only to determine whether the findings of the Commission are supported by 'substantial evidence.' Administrative Procedure Act 10(e)(B)(5), 5 U.S.C. 706(2)(E) (1970).
 
 
 28
 The Department of Justice submitted a brief in these proceedings in which it noted that it had urged the FCC to adopt PTAR. It expressed the view that the modification of the rule 'represents . . . a serious weakening (of) its basic purpose,' to reduce network dominance. However, the Department cited no factual basis for its assumption that PTAR had reduced or would reduce network dominance and its brief discloses no awareness of the Economist's Report. Though unhappy with the impact of the modifications of PTAR on competition, the Department ultimately concludes that, in light of the factors other than competition which the Commission had to consider, the FCC 'acted within its rule-making and policy-making responsibilities' in enacting those modifications.
 
 
 29
 Whether the FCC or this court need weigh the views of the Department of Justice on issues other than competition is a question we need not now decide. It is clear, however, that the nation's policy favoring competition is one which the FCC must incorporate in regulating the broadcast media. FCC v. RCA Communications, Inc., 346 U.S. 86, 94, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); National Broadcasting Co. v. United States, 319 U.S. 190, 218, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); cf. FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 137, 60 S.Ct. 437, 84 L.Ed. 656 (1940). It would seem that the views of the Department of Justice as to the impact of proposed rule modifications on competition would be relevant to the Commission's deliberations. Yet the Commission does not indicate that the Department participated in the proceedings, see Report, Appendix B, 44 F.C.C.2d at , and its discussion of the effect of PTAR on network dominance makes no reference to the views of the Department. Again, our review could be facilitated if the Commission solicited and evaluated the views of the Department on this issue.
 
 
 30
 Another economic issue raised by the current petitions is the impact of PTAR on employment of Americans, sometimes referred to by the Commission and the parties as 'the impact on Hollywood.' A substantial portion of access time has been filled with programs produced outside the United States.[14] The Commission's Report displays the same ambiguity about this development as it shows on many other issues. First the Commission states that the use of foreign shows is 'grounds for concern.' Next the Commission asserts that the issue involves 'areas outside the normal ambit of the Commission's expertise' and 'questions of general national policy which are basically beyond our jurisdiction to decide.' Report P98, 44 F.C.C.2d at . Finally, the Commission finds the whole issue too uncertain and complex. Id. P99, 44 F.C.C.2d at . A more decisive statement by the Commission on whether it sees 'the impact on Hollywood' as a legitimate matter for concern, what it finds that impact to be, and how it weighs that impact in its regulations would aid our review.
 
 
 31
 B. Consideration of Views of Various Groups
 
 
 32
 As we have noted, Congress has directed the FCC to make the public interest paramount in regulating the broadcast media. Communications Act of 1934 303, 47 U.S.C. 303 (1970). The Supreme Court has repeatedly stressed the primacy of the interests of the viewing public in the FCC's exercise of its powers. See, e.g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Thus the Commission must place the public interest above private interests in carrying out its duties, FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940), and must identify the public interest basis for its actions. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 852 (1970), cert. denied, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1971); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153, 1157 (1969), cert. denied, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972).
 
 
 33
 These dictates should apply with even greater force where the Commission's conduct has as broad an impact on the public as the Prime Time Access Rule. The rule directly affects what millions of Americans watch on television for an hour every night and, indirectly, may affect all prime time programming.
 
 
 34
 The courts have held that under such circumstances the FCC and other federal agencies must listen to the views of groups representing various segments of the public before taking action. As we stated in Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2d Cir. 1965), cert. denied, 384 U.S. 941, 89 S.Ct. 1462, 16 L.Ed.2d 540 (1966), the role of the Commission
 
 
 35
 'does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission.'
 
 
 36
 The Commission may reach compromises, Gross v. FCC, 480 F.2d 1288, 1290 (2d Cir. 1973); GTE Service Corp. v. FCC, 474 F.2d 724, 729 (2d Cir. 1973); WBEN, Inc. v. United States, 396 F.2d 601, 614 (2d Cir.), cert. denied, 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968), but it may not simply compromise between the interests of different broadcasting groups and gloss over the more fundamental public interest. See WBEN, Inc. v. United States, supra, 396 F.2d at 618.[15]
 
 
 37
 If parties do not volunteer to represent the various facets of the public interest the Commission must take the initiative to seek out such parties and develop a meaningful record. Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1119 (1971); Office of Communication of United Church of Christ v. FCC, 138 U.S.App.D.C. 112, 425 F.2d 543, 548-549 (1969).
 
 
 38
 We cannot say that the FCC totally failed to entertain or consider the views of groups other than the two major warring groups who are petitioners here.[16] For example, with respect to the 'impact on Hollywood' the Commission took comments from several labor union groups. See Report, Appendix D 1-7, 44 F.C.C.2d at . It also considered the complaints of parents and children in promulgating the exemption for children's specials. Id. at P83, 44 F.C.C.2d at .
 
 
 39
 However, without holding that the Commission's efforts were insufficient as a matter of law or requiring the Commission to conduct further proceedings, we do suggest that the Commission might have done more. Many persons and groups may have comments about the rule. The Commission should not only receive and carefully consider these comments but, as we have said, should affirmatively seek them out. One need not delve too deeply into the agency's report to ascertain that it has concentrated primarily on the comments of the two groups of petitioners, for it has admitted as much.[17]
 
 
 40
 We have already mentioned that the Commission might solicit the views of the Department of Justice concerning the impact of the rule on competition. It might also consult consumer groups and others on the effect of the rule on television advertising in prime time.[18] Minority groups might discuss the impart of the rule on programming for minorities. Playwrights and actors could offer their views on the effects of the rule on their professions. These are, of course, merely suggestions as to persons who might participate. The list is not binding and certainly not exclusive.
 
 IV.
 
 41
 We wish to emphasize once more that we do not intend the foregoing discussion to intimate any views on the merits of the various petitions before us. Nor do we direct the Commission to undertake any further proceedings, though, as we have indicated, it might be helpful if it did so. Neither should our failure to discuss other claims raised by petitioners be construed to suggest any views on the merits of those claims.
 
 
 42
 The petitions are granted to the extent that respondents may not enforce the proposed modifications of the Prime Time Access Rule prior to September 1975. Otherwise, we dismiss all petitions without prejudice to their being brought anew after the Commission has had an opportunity to conduct such further proceedings as it deems appropriate.
 
 
 
 *
 Of the United States District Court for the District of Utah, sitting by designation
 
 
 [1]
 For descriptions of events leading to adoption of PTAR see Report and Order, In re Consideration of the Operation of the 'Prime Time Access Rule,' Section 73.658(k) of the Commission's Rules (Feb. 6, 1974) (hereinafter 'Report') PP4-12, 44 F.C.C.2d , (1974); Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 470, 473-476 (2d Cir. 1971); In re Amendment of Part 73 of the Commission's Rules and Regulations, 23 F.C.C.2d 382, 382-83 (1970); In re Amendment of Part 73 of the Commission's Rules and Regulations, 25 F.C.C.2d 318, 319-20 (1970). The original rule as promulgated read:
 '(k) Prime time access rule. ' (1) After October 1, 1971, no television stations, assigned to any of the top fifty markets in which there are three or more operating commercial television stations, shall broadcast network programs offered by any television network or networks for a total of more than three hours per day between the hours of 7:00 p.m. and 11:00 p.m. local time, except that in the Central Time Zone the relevant period shall be between the hours of 6:00 p.m. and 10:00 p.m. '(2) For the purpose of subparagraph (1) of this paragraph, network programs shall be defined to exclude special news programs dealing with fast-breaking news events, on-the-spot coverage of news events and political broadcasts by legally qualified candidates for public office. ' (3) The portion of the time from which network programming is excluded by subparagraph (1) hereof may not after October 1, 1972, he filled with off-network programs; or feature films which within two years prior to the date of broadcast have been previously broadcast by a station in the market. '(4) The top fifty markets shall be determined on an annual basis as of September 1 according to the most recent American Research Bureau prime time market rankings (all home stations combined) throughout the United States. ' (5) Nothing in this paragraph shall be construed to apply to educational, non- commercial, or public broadcasting station licensees in their use and exhibition of program materials supplied through one or more non-commercial, educational, or public broadcasting television network systems.'
 
 
 [2]
 To supplement PTAR the Commission also enacted the 'financial interest' and 'syndication' rules, 47 C.F.R. 73.658(j) (1973). These rules prohibit each network from acquiring any financial interest in a program not produced solely by that network and from syndicating programs for non-network or foreign television
 
 
 [3]
 Section 73.658(k) was amended to read:
 'Evening programming requirements. The provisions of this paragraph apply to stations in the top-50 U.S. television markets which are regular affiliates of, or commonly owned with one of the three national television networks (as defined in paragraph (j) of this section), with respect to their evening programming starting on the date between September 1 and October 1, 1974, which their network designates as the start of its 'new season'.
 '(1) After such date in September 1974, each station shall devote not less than six (6) half-hours between 7:30 p.m. and 8:00 p.m. E.T. and P.T. (6:30 and 7:00 p.m. CT and MT) Monday through Saturday to programs which are not network, off-network or feature film; Provided, however, That;
 (i) one (1) of these six (6) half-hours each week may consist of children's specials, documentaries or public affairs programming, either network originated or offnetwork.
 (ii) 'documentary' programming means any program which is non-fictional and educational or informational, but not including programs where the information is used in a contest among participants.
 '(2) The following types of material are not considered 'network programming' for purposes of this paragraph, so that they may be presented without limitation during the Monday-Saturday time periods mentioned in subparagraph (1) hereof:
 (i) 'Runovers' of sports events carried on the network during late afternoon or early evening hours, if the telecast of the event (and accompanying pre-game and post-game material, if any) is scheduled so that in the normal course it would be concluded by 7:00 p.m., ET.
 (ii) For stations in the Mountain and Pacific time zones, the 'live' broadcast of any 'simultaneous' network programming, such as sports events or some other special events, which are broadcast simultaneously throughout the 48 contiguous states; provided the network's schedule for the evening including such telecasts complies with the provisions of this paragraph with respect to stations in the Eastern and Central time zones.
 (iii) Telecasts of an international sports event such as the summer or winter Olympic games, New Year's Day college football games, or any other network programming of a 'special' nature other than sports events or motion pictures, when the network devotes all of its time after 8 p.m. E.T. or P.T. (7 p.m. C.T. or M.T.) the same evening to the same programming, or all of it except brief incidental 'fill' material.
 (iv) 'Pre-game shows' in connection with important sports events carried by the networks (e.g., the World Series), on no more than five occasions per broadcast year.
 (v) Special news programs dealing with fast-breaking news events, on-the-spot coverage of news events or programming related to such events, and political broadcasts by or on behalf of legally qualified candidates for public office.
 (vi) Material carried on a commercial or other network other than the three national networks as defined in paragraph (j) of this section.
 '(3) For those portions of the Eastern and Central times zones where 'daylight saving time' is not observed for part or all of the year, during the portion of the year when it is not observed, the times which must be 'cleared' of network, off-network and other feature film material shall be one hour earlier than those specified in subparagraph (1) of this paragraph, except for stations which regularly delay network evening programs and rebroadcast them an hour later.' Report, Appendix A, 44 F.C.C.2d at .
 
 
 [4]
 The Report also contained the following at P3(c)
 'Although not stated in the rule, it is expected that some of the five or six half-hours thus 'cleared' of network, off-network and feature film material will be used by stations for programs relating to minority affairs, children's programs, or other programs directed to the needs and problems of the station's community and coverage area, as disclosed in its ascertainment process.' 44 F.C.C.2d at .
 
 
 [5]
 American Broadcasting Companies, Inc. filed a brief in support of the rule as modified. The Columbia Broadcasting System, Inc. originally advocated repeal of the rule but now supports the Commission's action as a reasonable compromise. The Justice Department also filed a brief in support of the modified rule
 
 
 [6]
 Westinghouse Broadcasting Company, Inc. commenced an independent action for review seeking essentially the same relief as NAITPD. Time-Life Films, Inc. intervened and also supports the views of NAITPD. Sandy Frank Co. appeared as an amicus curiae and expressed similar views
 
 
 [7]
 Columbia Pictures Industries, Inc. joined the petition of Warner Bros. The National Committee of Independent Television Producers, Samuel Goldwyn Productions, and MCA, Inc. intervened and also support the views of Warner bros
 
 
 [8]
 Moreover, in proceedings concerning the original rule, MCA claimed that it needed about one year to prepare a program series. 25 F.C.C.2d at 335
 
 
 [9]
 See 23 F.C.C.2d at 386, 395
 
 
 [10]
 'Where a rule has retroactive effects, it may nonetheless be sustained in spite of such retroactivity if it is reasonable.' 449 F.2d at 863. 'The Commission should be enabled to remedy the problems . . . by retroactive adjustments, provided they are reasonable.' Id
 
 
 [11]
 As the Supreme Court stated in SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947):
 'Such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law. See Addison v. Holly Hill Co., 322 U.S. 607, 620, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488.'
 
 
 [12]
 Final Report, 'The Economic Consequences of the Federal Communications Commission's Prime-Time Access Rule on the Broadcasting and Production Industries' (September 1973) (hereinafter 'Economist's Report'). Page references are to the typescript of the report
 
 
 [13]
 'It was vigorously urged that the rule works to increase network control and dominance, rather than lessening it, by creating an artificial scarcity of prime time and strengthening the networks' control over what remains vis-a-vis advertisers and program suppliers. This must be regarded as somewhat speculative, in view of the strong degree of dominance inherent in the networks' position, as long as they are three sellers on the one hand, as against hundreds of potential national advertiser customers, and three buyers on the other hand facing more than 100 producer-sellers. By contrast, the reduction in control through removing 11 or 12 hours a week from 'the network funnel' is definite and readily apparent. It is true that the role of the owned stations in the success of access-period material is considerable, but this appears to be somewhat less true now, when these stations are buying somewhat less as a group. We do not find in these considerations any reason, at this time, to act to relax the rule any more than indicated above.' Report P97, 44 F.C.C.2d
 
 
 [14]
 The extent of the resulting impact, if any, on American employment was vigorously disputed by a number of parties. See Report PP32(5), 32(6), & Appendix D, 44 F.C.C.2d at , , &
 
 
 [15]
 Several passages in the Commission's report might be construed to mean that it had reached just such an impermissible compromise. See, e.g., Report P82, 44 F.C.C.2d at
 
 
 [16]
 For a list of the parties who participated in the proceeding see Report PP26-28, Appendix B, 44 F.C.C.2d at
 
 
 [17]
 'Most of the discussion (in the Report) is based on the 12 longer comments filed (by the major producing and broadcasting interests).' Report P31, 44 F.C.C.2d at
 
 
 [18]
 One objection raised to the rule is that it produced an increase of commercials in access time. Proponents of the rule respond that this development was offset by increased opportunity for local advertisers. See Report PP32(4), 100, 44 F.C.C.2d at