PUBLIC SERVICE COMPANY OF COLORADO, Arizona Public Service Company, Idaho Power Company, Montana Power Company, Pacific Power & Light Company, Southern California Edison Company, Plaintiffs,

v.

Cecil D. ANDRUS, Secretary of the Interior, Curt Berlund, Director of Land Management, Dale Andrus, Director of the Colorado State Office of the Bureau of Land Management, Robert O. Boffington, Director of the Arizona State Office of the Bureau of Land Management, Edward Hartey, Director of the California State Office of the Bureau of Land Management, William L. Mathews, Director of the Idaho State Office of the Bureau of Land Management, Edwin Zaidlicz, Director of the Montana State Office of the Bureau of Land Management, E. I. Rowland, Director of the Nevada State Office of the Bureau of Land Management, Murl W. Storms, Director of the Oregon State Office of the Bureau of Land Management, Daniel P. Baker, Director of the Wyoming State Office of Bureau of Land Management, Defendants.

Civ. A. No. 76–F–48.

United States District Court, D. Colorado.

May 31, 1977.

Bryant O'Donnell, James R. McCotter, Kelly, Stansfield & O'Donnell, Denver, Colo., and Francis M. Shea, Richard T. Conway, William S. Moore, James R. Bieke, Shea & Gardner, Washington, D. C., for plaintiffs.

Cathlin Donnell, U. S. Atty., by Hank Meshorer, Dept. of Justice, Denver, Colo., and James P. Gatlin, U. S. Asst. Atty., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge:

Plaintiffs are six utility companies who provide electrical services to the Western states. They bring this declaratory and injunctive case requesting review of regulations dealing with charges assessed by the Secretary of the Interior. On cross motions for summary judgment the parties seek declaratory relief determining the legality of the regulations. The parties have filed a statement of uncontested facts.[1] In addition, numerous exhibits have been admitted into evidence.

---

1. The statement consists of 74 numbered paragraphs. References to the stipulation will be cited as "Stip. Para. ——".

Specifically, plaintiffs challenge certain regulations promulgated by the Bureau of Land Management (BLM), Department of the Interior, requiring applicants for rights of way across public lands to reimburse the government for costs incurred in the processing and monitoring of the applications. In connection with plaintiffs' operations in six western states providing electrical service, plaintiffs obtain rights of way across federal lands for electric power transmission and distribution lines. Plaintiffs do not contest the requirement that they pay fair market value to the government for the rights of way. What is contested are the charges made under the regulations for the processing of rights of way applications and monitoring the activities of the applicant after a right of way has been granted.

## I.

The reimbursement regulations which we review, 43 C.F.R. § 2802.1–2 *et seq.* became effective on June 1, 1975. They require applicants and holders of rights of way across government land to reimburse BLM for its costs in processing right of way applications and monitoring the applicant's activities along the granted right of way. Prior to the effective date of the regulations, the BLM required only a $10.00 filing fee for the processing and monitoring functions. Stip. Para. 19.

On October 21, 1976 the Federal Land Policy and Management Act (FLPMA) became effective. The FLPMA was designed to provide BLM with "a modern statutory management mandate" for the administration of public lands. S.Rep.No. 94–583, 94th Cong. 1st Sess. at 34 (1975). It appears that reimbursement costs for right of way applications pending after the effective date of the FLPMA will be assessed under the new act. The Secretary of the Interior has not yet interpreted the Act nor promulgated regulations thereunder. Thus, the reimbursement regulations which we review have had a short lifespan—from their effective date in June of 1976 to the enactment of the FLPMA in October of 1976.[2]

Under the reimbursement regulations an applicant must submit with its application a non-returnable sum in an amount fixed by the regulations. Sec. 2802.1–2(a)(3). After a right of way is granted, the applicant is required to submit another fixed amount to reimburse the government for the costs associated with the monitoring of the right of way. Sec. 2802.1–2(b)(2). Both fees are based on the size or length of the project. The monitoring is an incident to the issuance of the right of way and concerns construction requirements such as avoiding changes in the natural flow of surface waters, minimal disturbance of flora and the like.

Where "actual costs" attributed to a right of way exceed the non-returnable fixed fee for processing or monitoring, the applicant is required to reimburse the BLM for the difference. Sec. 2802.1–2(a)(4)–(8), (b)(3) and (b)(4). If an applicant withdraws its application prior to approval, or the application is denied, it remains liable for reimbursement of the actual costs involved in the incompleted processing. Sec. 2802.1–2(a)(6) and (7). Actual costs are composed of two elements: direct and indirect costs. All costs which can be readily identified to a particular applicant through the BLM's cost accounting system are charged to it as direct costs. These costs include the salaries and benefits paid to technical specialists assigned to preparing environmental impact statements; travel associated with the project; contracts to gather inventory data needed in preparation of the impact statement; land examination work; field inspections of the proposed route; public relations and public affairs work; wages paid to BLM employees for the time spent on a particular project; and various technical, clerical and administrative support costs (including employee training and employee safety training). Stip. Paras. 42–49.

---

**2.** Because the Secretary of the Interior has not yet interpreted the FLPMA nor, to our knowledge, issued regulations under it, the court has previously declined to rule on the issues presented concerning the FLPMA.

Indirect costs include the salaries of office heads and general administrative personnel in multi-functional offices. They include the costs of organizational components whose work cannot be readily allocated to a particular applicant, such as work accomplished in the BLM's records system division the Office of Equal Employment Opportunity and safety officers. Indirect costs also include the costs of services which would be difficult or impossible to allocate to individual applicants. For example, telephone bills, office space rental, postage and employee transfer costs. Since indirect costs by their nature cannot be assigned to a particular project they are assessed at the rate of 30 percent of direct costs assessed. Stip. Paras. 50–54.

Paul M. Vetterick, Chief of the Division of Budget and Program Development, BLM, was involved in the drafting, promulgation and enforcement of the reimbursement regulations. In his affidavit, Mr. Vetterick states that "The reimbursement regulations were drafted with the intention that *all costs incurred* by the BLM on behalf of an applicant's project was to be the *sole measure* of the required reimbursement." (Emphasis added.)

As of November 1, 1976, all of the plaintiffs but one have been charged actual costs above the fixed fees.[3] Altogether, plaintiffs have been billed some $1.6 million of which over $1.4 million has been paid. Part of the $1.6 million was assessed against applications which were pending on the effective date of the regulations, June 1, 1975, but for work which was accomplished prior to that effective date. *See* Sec. 2802.1–2(a)(15).

The largest portion of the actual costs assessed are the result of the environmental analysis and environmental impact statement which is prepared for each right of way application. *See* Sec. 2802.1–2(a)(1). Approximately 80 percent of the direct costs are attributable to these reports. In preparing its environmental reports, the BLM does not merely consider the impact of the project over the right of way. Rath-

er, the entire area within the project's "sphere of influence" is reviewed. Thus, if a plaintiff were to construct a power generating plant on private land, but some part of the transmission line runs across federal lands, environmental reports could consider the impact of the entire project. Stip. Para. 55.

BLM Instruction Memorandum 76–263, dated May 18, 1976 (Ex. 24), was circulated to aid in the determination of those portions of a project which are within the sphere of influence. One example in the memorandum posits a situation where a proposed electric generating plant situated on private lands requires transmission lines across federal lands. The commentary accompanying the graphic example states:

All costs related to right of way applications are costs recoverable and chargeable. . . . In this example, the "sphere of influence" would include costs associated with the proposed power generating plant, its coal source and the proposed rights of way for the pipeline and transmission lines. *The rights of way are the key mechanisms for developing the project. Without the issuance of these grants, the project could not be implemented.* (Emphasis added.)

If the reimbursement payments made by an applicant exceed the BLM's costs, the agency may either refund the excess or apply it to the "next billing". 43 C.F.R. § 2802.1–2(a)(8).

## II.

Defendant officials of the Interior take the position that this court is without jurisdiction to determine the validity of plaintiffs' claims insofar as they allege the taking of private property without due process of law. It is asserted that 28 U.S.C. § 1491 (the Tucker Act), prohibits district courts from determining monetary claims against the United States which exceed $10,000. The short answer to this contention is that we have not been asked to adjudicate a monetary claim against the

---

3. Public Service Company of Colorado has paid only the fixed fees set by the regulations.

United States. Rather, in this action for declaratory relief, the court is beseeched to determine the validity of certain administrative regulations. That our determination may have some incidental affect on the fisc (as do most declaratory judgments against the government) does not deprive this court of jurisdiction. This is not a suit "for liquidated or unliquidated damages" or founded upon "an express or implied contract". 28 U.S.C. § 1491. Rather, as the complaint reveals, plaintiffs merely seek declaratory and injunctive relief against defendants. The court has jurisdiction to grant the relief requested. *See also, National Ass'n of Broadcasters v. F. C. C.*, 554 F.2d 1118 (D.C. Cir. 1976) discussed *infra.*

### III.

The Preamble to the reimbursement regulations state that they were issued:

█n accordance with the policy expressed in Title V of the Independent Offices [Appropriation] Act of 1952 (31 U.S.C. Sec. 483a); authority contained in Sections 201 and 204 of the Public Land Administration Act (43 U.S.C. Secs. 1371, 1374) and the requirements of Section 28(*l*) of the 1973 amendments to the Mineral Leasing Act as to oil, gas and other pipelines.

40 *Fed.Reg.* 17841 (1975). Plaintiffs claim that none of the stated sources are authority for the regulations as presently formulated. We agree.

█ It is clear, by the very terms of the Preamble, that the Mineral Leasing Act, 30 U.S.C. § 185, cannot serve as the basis for reimbursement of costs involved in the granting of rights of way for electrical transmission lines and related equipment. The Act is limited in its scope to rights of way "for the transportation of oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom." *A fortiori*, § 185(*l*) dealing with reimbursement of costs under the Act cannot provide the authority for the reimbursement regulations as applied to suppliers of electrical energy.

The Public Land Administration Act (PLAA) was repealed on October 21, 1976 by the Federal Land Policy and Management Act, which substantially reenacted the reimbursement provisions of the PLAA. Nonetheless, the PLAA is urged as supportive authority for the reimbursement regulations during their lifetime and must be considered. The Preamble of the regulations refers to Sections 201 and 204(a) of PLAA, 43 U.S.C. §§ 1371 and 1374. Section 204(a), 43 U.S.C. § 1374, cannot serve as authority for the imposition of costs against applicant since it deals only with refunds of over-payments made by applicants.

Section 201, 43 U.S.C. § 1371 provides in part:

Notwithstanding any other provision of law, the Secretary of the Interior may establish reasonable filing fees, service fees and charges, and commissions with respect to applications and other documents relating to public lands and their resources under his jurisdiction, and may charge and abolish such fees, charges and commissions.

The text of the statute seems to lend support to defendants' imposition of the reimbursement charges assessed here. The force of the language is diminished, however, when one consults the legislative history of the statute. The Legislature's history is of persuasive effect in our understanding of the revenue-making regulations. The Legislature's understanding of the effect of Section 201 is partially revealed in Senate Report No. 1755, 86th Cong., 2d Sess. (1960), 2 U.S.Code Cong. and Admin.News p. 3147 (1960).

There a letter from Roger Ernst, Assistant Secretary of the Interior, was reproduced, which indicated the anticipated effect of Section 201. Mr. Ernst indicated that the bill involved only five percent of the business volume covered by BLM fees. He also noted that "receipts from fees, etc., accruing to the Bureau approximate $1 million annually. It is estimated that this bill, if enacted, will increase these receipts by approximately $50,000 annually." Thus, the Senate, at least, believed that the fee

structure envisioned by Section 201 would add only a minimal amount to the fees charged by the BLM. It is doubtful that the Senate passed the bill with any awareness that it might be used to charge nearly $1 million to a single right of way applicant, when the total fees charged at that time by the BLM did not exceed that amount.

Mr. Ernst's letter included examples of the anticipated fees. The fees reviewed were nominal at best. As an example, the fee for a BLM declaratory statement would be raised from $2 or $3 to $10. Homestead application fees would be increased from $5 or $10 to $25 in all states but Alaska, where the fee remained $10. Other examples supplied to the Senate dealt with *de minimus* charges for transcripts (which were raised from ten cents per 100 words to cost).

The Senate understanding of Section 201 was obviously intended to allow the Secretary some flexibility in setting fees for services rendered for the primary benefit of the requesting individual. Nonetheless, it can hardly be maintained that the Senate intended to thereby allow the Secretary to impose fees ranging into the tens and hundreds of thousands of dollars such as those imposed in this case. While defendants state that the fee increases permitted the PLAA are not nominal, but instead represent "for the most part either a five or ten fold rise from the earlier fee", we cannot give an increase from $2 to $10 the same significance. *See Defendants' Reply Brief in Support of Their Motion for Summary Judgment* at 11 n.9.

The history of the bill in the House of Representatives is somewhat more revealing. A letter from Fred G. Aandahl, Assistant Secretary of the Interior is reprinted in H.R. Report No. 1249, 86th Cong. 2d Sess. (1960). In speaking of the need to update fees for services, Mr. Aandahl states:

> The fee system can only be rationalized if flexible authority is placed in the Secretary to fix those fees. In some cases no specific statutory provision has been made for the payment of service charges *by those who are the primary beneficiar-*

*ies of such services.* Examples of such services are the handling and recording of papers, the taking of depositions, the preparation of transcripts of hearings or other proceedings, and the making of surveys and field examinations. (Emphasis added.)

The last sentence of the quoted portion reveals that the charges intended to be included under the PLAA were not simply minor sums for recording and transcription services. Rather, the Legislature envisioned some larger charges for items such as the making of field surveys and services. This can be translated, in the contemporary context, to include charges for environmental impact reports. Nonetheless, such charges were to be imposed only against "those who are the primary beneficiaries of such services". The phrase "primary beneficiary" has not been interpreted in relation to Section 201 of the PLAA, 43 U.S.C. § 1371. It was, however, a term of common usage during the period when the Aandahl letter was transmitted to the House of Representatives. That usage will be considered in our analysis of the Independent Offices Appropriation Act of 1952 (IOAA), 31 U.S.C. § 483a. The understanding of the term "primary beneficiary" as it relates to the IOAA will be persuasive as to its meaning as used in the later Public Land Administration Act.

## IV.

The Independent Offices Appropriation Act of 1952, 31 U.S.C. § 483a, provides in part:

> It is the sense of the Congress that any work, service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration, or similar thing of value or utility performed, furnished, provided, granted, prepared, or issued by any Federal agency . . . to or for any person . . . shall be self-sustaining to the full extent possible, and the head of each Federal agency is authorized by regulation . . . to prescribe therefor such fee, charge, or price, if any, as he shall

determine . . . to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts. . .

The Supreme Court recently reviewed the proper scope of the Independent Offices Appropriation Act (IOAA). In *National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the Court stated that the IOAA did not delegate the constitutional authority to impose a tax on regulated industries. Instead, the statute only permitted agencies the authority to charge for services rendered. The Court stated:

The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society. It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power that we read 31 U.S.C. Sec. 483a narrowly as authorizing not a "tax" but a "fee". A "fee" connotes a "benefit" and the Act by its use of the standard "value to the recipient" carries that connotation.

415 U.S. at 340–41, 94 S.Ct. at 1149. Later, the Court stated that "the phrase 'value to the recipient' is, we believe, the measure of the authorized fee". 415 U.S. at 343, 94 S.Ct. at 1150.

The Court amplified its *National Cable* analysis in a companion case, *Federal Power Commission v. New England Power Co.,* 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). There, the Court reviewed the history of the IOAA which revealed that "The Committee is concerned that the Government is not receiving full return from many of the services which it renders to *special beneficiaries* ". H.R.Rep.No. 384, 82d Cong., 1st Sess., 2 (Emphasis added).[4] The concern expressed by the House Committee on Interior and Insular Affairs was considered by the Office of Management and Budget in its Circular No. A–25 (1959) (Ex. 32). At paragraph 3 of the Circular it is stated that:

Where a service (or privilege) provides special benefits to an identifiable recipient above and beyond those which accrue to the public at large, a charge should be imposed to recover the full cost to the Federal Government of rendering that service. No charge should be made for services when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefiting broadly the general public (e. g. licensing of new biological products).

The Court specifically adopted the quoted language as the proper construction of the IOAA. 415 U.S. at 351, 94 S.Ct. 1146. The Court also adopted the conclusion that a reasonable charge should be made to each identifiable recipient for a measurable unit or amount of government service from which he derives special benefit.

In interpreting when a governmental service specially benefits an identifiable recipient, rather than primarily benefiting the general public, an example can be instructive. In a 1950 Senate report a difference was noted between the Department of Agriculture's meat inspection program and its meat grading program. A meat inspection is, of course, required before any packager can market its product. Nonetheless, the service was rendered "for the good of all the people" and "no charge could in propriety be made". The meat grading service, however, is rendered only upon request and "is designed primarily to establish grades of excellence of food products rather than their edibility from a public health standpoint . . . the costs being borne by the producers and marketers in recognition of the fact that the service is directed especially to their benefit". S.Rep. No. 2120, 81st Cong., 2d Sess. (1950).

■ The Circuit Court of Appeals for the District of Columbia has provided another instructional example. In *Electronic Indus-*

---

**4.** The phrase "special or primary beneficiaries" was alluded to in our discussion of the Public

Land Administrative Act, 43 U.S.C. Sec. 1371, *supra.*

*tries Ass'n. v. F.C.C.*, 554 F.2d 1109, No. 75–1120 (D.C. Cir. 1976), the Court observed that the F.C.C., in granting an "equipment type" approval is required to incur expenses for testing or inspecting the equipment. 47 U.S.C. § 302a. The applicant is required to reimburse the agency for the costs involved since "[t]hese activities have undisputed private benefit although they may also create incidental public benefits". *Id.* at 1115. When, however, the agency tests further to determine whether the equipment meets standards for consumer safety "it would be doing so to satisfy some independent public interest, and the charge for these additional expenses could not be included in fees imposed on equipment owners". *Id.* This would be true, despite the fact that the consumer safety testing is required by law in order to market the product. Thus, like the meat inspection, before a fee can be charged to an applicant, the service must *primarily* provide special benefits to an identifiable recipient. In saying that the service must primarily benefit the applicant, we are saying that the applicant must receive some benefit which does not accrue to the public generally. And it is not enough that the service is required in order to grant some privilege or license to the applicant. "Therefore it is clear that under [*National Cable Television Association*] expenditures made to benefit the public are required to be excluded from a proper fee". *Electronic Industries Ass'n., supra* at 1114. "The costs assessed may include a pro-rata share of any expenses for regulatory activities which are necessary in order to grant [a license or privilege], *but cannot include those expenses independently required to protect the public*". *National Cable Television Ass'n., Inc., v. F.C.C.*, 554 F.2d 1094 at 1101, No. 75–1053 (D.C.Cir. 1976) (emphasis added). Of course, if a service rendered primarily for the benefit of the applicant also provides some incidental benefit to the public, this need not prevent the agency from charging the full cost of the service to the applicant. It is assumed that all government regulations provide a public benefit of some kind; *National Cable*, 415 U.S. at 341 and 343, 94 S.Ct. 1146, but this need not prevent an agency from charging for *any* service.

## V.

Plaintiffs argue that many of the charges made under the reimbursement regulations, 43 C.F.R. § 2802.1–2, are for services intended for the primary benefit of the general public. The major concern is the costs associated with the preparation of the environmental analysis and impact statements which comprise nearly 80% of the direct costs. Other items of concern are charges for the BLM's public relations and public affairs programs and employee safety training costs.

It is without serious question that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Secs. 4321, *et seq.*, which requires the promulgation of environmental analyses and impact statements, was enacted for the primary benefit of the general public. The declared purpose of the Act was to foster a national policy encouraging productive and enjoyable harmony and balance between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and the biosphere; to stimulate the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the nation; *See, National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971); and *Daly v. Volpe*, 376 F.Supp. 987 (W.D.Wash.1974), aff'd, 514 F.2d 1106 (9th Cir. 1975). Thus, it is suggestive that the environmental reports which result from the normal processing of a right of way application are not services rendered for the special benefit of the applicant. Instead it is clear that the "*ultimate* beneficiary is obscure and the service can be primarily considered as benefiting broadly the general public". Circular A–25, *supra; FPC v. New England Power Co., supra.*

Defendants maintain that the reports primarily benefit plaintiffs because without them no rights of way could be granted under the law. Such reasoning, however, would permit an agency to charge for all

services rendered to an applicant for a license or privilege, since presumably all services rendered are the result of the voluntary application for a right of way. Indeed, the Vetterick affidavit states that the intent of the regulations was to use as the sole measure of reimbursement the total of all costs incurred by the BLM, apparently without concern whether the applicant was the primary beneficiary of any particular service. We reject this contention.

■ The costs of environmental analyses and impact statements developed pursuant to the mandate of the National Environmental Policy Act are not of primary benefit to the right of way applicant, and thus cannot properly be charged as fees under either the Independent Offices Appropriation Act of 1952, 31 U.S.C. § 483a, or the Public Land Administration Act, 43 U.S.C. § 1371. We are not so certain whether other charges complained of (e. g., public relations and employee safety training) are designed primarily for the benefit of the applicant and thus the proper subject of fees. However, in light of our order, we need not determine the propriety of each factor considered by defendants in establishing their fee schedule.

### VI.

As noted above, the Supreme Court has held that the proper measure of a fee is the value to the recipient. *National Cable, supra*, 415 U.S. at 342–343, 94 S.Ct. 1146. The value of a governmental service to a recipient can be calculated in a number of ways, and without further explanation the concept can be misleading.

The focus of the BLM in measuring the reimbursement fees seems to be the total value ultimately derived by the applicant as a result of the rights of way granted. For example, defendants have stated in their Answer Brief, filed November 19, 1976, at 5–6:

> To begin with, one must not lose sight of the fact that as the result of the processing of their applications for rights of way by the defendants the plaintiffs receive a very special benefit—the exclusive use of the public lands for immense profit.

In its Instruction Memorandum 76–263, *supra*, the BLM informed its employees that all costs related to right of way applications are cost recoverable because "without the issuance of these grants, the project could not be implemented". The attitude that all costs are recoverable because of the ultimate monetary value of the rights of way seems to pervade the reimbursement regulations.

■ Because the statutes authorizing cost reimbursements permit only a fee for services rendered and not a tax, the BLM's present approach is improper. As a fee, the BLM must measure its reimbursement demands only by the actual costs to the agency. To include the ultimate value to the applicant in its considerations taints a reimbursement plan into a revenue scheme. In *National Cable Television Ass'n., Inc. v. F.C.C.*, 554 F.2d 1094 at 1107, No. 75–1053 (D.C. Cir. 1976), the Court observed:

> In order to assure this required relationship between the fee-rate and the services rendered as we interpret the Supreme Court opinion, the agency must look *not* at the value which the regulated party may immediately or eventually derive from the regulatory scheme, but at the value of the direct and indirect services which the agency confers. This means, for example, that a fee, in order not to be a tax, cannot be justified by the revenues received or the profits which cable operators have made from their franchises, but must be reasonably related to those attributable direct and indirect costs which the agency actually incurs in regulating (servicing) the industry.

The Court was more direct in *National Ass'n. of Broadcasters v. F.C.C., supra* at 1129–1130 n. 28: "When the cost of the benefit conferred is exceeded by any material amount, one immediately gets into the taxing areas and the result is a revenue and not a fee". It is the cost to the agency which determines the value to the recipient. The fee schedules should be structured accordingly.

## VII.

Plaintiffs also protest the assessment against applications pending on the effective date of the reimbursement regulations, expenses incurred in processing applications prior to that date. Section 2802.1–2(a)(15) provides that the reimbursement regulations are applicable to all applications or permits pending on June 1, 1975, the effective date. The BLM has approached this issue in *Arizona Public Service Co.*, 20 IBLA 120 (1975) (Ex. 8), where it said that only the $10 fee should be charged for rights of way granted prior to the effective date of the reimbursement regulations. However, the BLM has never ruled directly on the issue now before us. At this time we only canvass the outer parameters of the regulation and leave direct interpretation of Section 2802.1–2(a)(15) to agency consideration.

We start with the proposition that the regulations seem to have some retroactive effect. While they became effective on June 1, 1975 and were published in final form on April 23, 1975 (40 F.R. 1784 [1975], it is likely that application processing expenses were incurred before either of those two dates.[5] The fact that the regulations provide for recovery of all chargeable costs involved in processing application *then pending* seems a clear indication that some retroactive effect was anticipated and intended.

█ Retroactivity in agency rules is not itself prohibited. A rule is not invalid merely because it has retroactive consequences or modified pre-existing interests. *General Telephone Co. v. United States*, 449 F.2d 846, 863 (5th Cir. 1971). Due process concepts only prevent retroactive rules which are deemed to be unreasonable. *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938); *National Ass'n. of Independent Television Producers v. F.C.C.*, 502 F.2d 249 (2d Cir. 1974); *General Telephone Co. v. United States, supra*; K. Davis 1 *Administrative Law Treatise* Sec. 5.08 (1958).

█ In this case, even if some retroactivity exists we do not see the unreasonableness that plaintiffs suggest. Plaintiffs were not mislead by the BLM. *Cf., National Ass'n. of Independent Television Producers, supra*. Instead, they were warned in advance of the effective date of the regulations that if applications were pending on June 1, 1975 the applicant would become liable for proper costs of processing and monitoring. *Cf., N.L.R.B. v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966). Plaintiffs had the option to withdraw their applications before June 1, 1975, but chose not to do so. Thus, if it is determined by the BLM that the reimbursement regulations have retroactive effect they would not fail on that ground.

█ Plaintiffs additionally contend that the BLM is not authorized to require reimbursement of costs incurred prior to the filing of a right of way application. In certain cases, an applicant will consult with defendants before actually filing an application. When the application is filed, plaintiffs are charged not only for the costs of processing and monitoring which are incurred subsequent to the filing, but for any costs incurred during the pre-filing consultations. In our view, the agency should have the initial opportunity to interpret its regulation. We conclude only that the statutory scheme would not be offended if the BLM determines such costs as being within the application process.

## VIII.

█ Since this action is one for a declaratory judgment and the Court has determined defendants' measure of the fees charged to be improper, it is incumbent upon us to provide some guidance. The IOAA, 31 U.S.C. § 483a, provides that it is the sense of the Congress that agencies shall establish fees to the end that they become self-sustaining *to the fullest extent*

5. Notice of the proposed regulations were published in the *Federal Register* on September 3, 1973. 39 F.R. 31906 (1974).

*possible.* The *National Cable* decision, and other case law, places limits on the extent to which such self-sufficiency can be realized through a fee system. In setting guidelines those set forth in *National Cable Television Ass'n., Inc., supra; Electronic Indus. Ass'n, supra; National Ass'n Broadcasters, supra;* and *Capitol Cities Communications, Inc. v. F.C.C.,* 554 F.2d 1135 (D.C. Cir., 1975) are instructive:

> Briefly, we have interpreted the "value to the recipient" standard to include a number of specific requirements. First, the Commission must *justify* the assessment of a fee by a clear statement of the particular service or benefit which [an applicant] is expected to reimburse. Second, it must calculate the *cost basis* for each fee assessed. This involves (a) an allocation of the specific expenses which form the cost basis for the fee to the smallest practical unit; (b) exclusion of any expenses incurred to serve an independent public interest; (c) a public explanation of the specific expenses included in the cost basis for a particular fee, and an explanation of the criteria used to include or exclude particular items. Finally, the [agency] must set a fee calculated to return this cost basis at a *rate* which reasonably reflects the cost of the services performed or value conferred upon the payor.

*National Ass'n of Broadcasters, supra* at 1133. In its computations defendants may include both direct and indirect costs attributable to the processing or monitoring of an application. There is no requirement that the fees assessed represent the exact cost of the services to the agency. "To be valid, a fee need only bear a reasonable relationship to the cost of the services rendered by the agency". *National Cable Television Ass'n., Inc. v. F.C.C., supra,* at 1108. The per mile rates contained at 43 C.F.R. § 2802.1–2(a)(3)(i)–(ii) and (b)(2) (i)–(ii) are not improper if they bear a reasonable relationship to the costs of the agency. If, however, the per mile rates bear no reasonable relationship to agency costs, those rates cannot be assessed.

Defendants may include the expense of indirect costs in formulating their fees. Generally speaking, however, reimbursement for nebulous and indirect costs is more difficult of resolution. Defendants must justify each aspect of indirect cost in the same manner used for direct costs. The court does not believe that it has been presented with sufficient evidence to rule on each component of indirect cost. Nonetheless, we state at this point that it is difficult to imagine how costs such as employee safety training and equal opportunity can meet the special benefit criteria.

After determining the amounts which were properly chargeable, defendants should comply with 43 C.F.R. § 2802.1–2(a)(8), dealing with refunds or offsets of overpayments.

## ORDER

We conclude that (a) the regulations as presently constituted and enforced exceed the authority granted defendants under the relevant acts of Congress; (b) the proper measure of a fee is generally the benefit to the recipient; and (c) defendants' fee structure as presently constituted and enforced does not exhibit the necessary nexus between the benefit to the recipient and the fee charged. It is, therefore, ORDERED, DECREED AND ADJUDGED:

1. Upon the issues joined, defendants' Motion for Summary Judgment is DENIED and plaintiffs' Motion for Summary Judgment is GRANTED in the following respects:

2. The Mineral Leasing Act, 30 U.S.C. § 185 does not provide authority for defendants' reimbursement regulations, 43 C.F.R. § 2802.1–2, as applied to plaintiffs.

3. The Independent Offices Appropriation Act, 31 U.S.C. § 483a, and the Public Land Administration Act, 43 U.S.C. §§ 1371, et seq., provide authority for the imposition of fees or service charges against plaintiffs when the fees are imposed for services which provide special benefits to plaintiffs beyond those which accrue to the public at large.

4. There must be a fair and rational nexus between the fees charged and services rendered by the agency, and defendants may only assess as costs the expenses of those items which provide special benefits to plaintiffs beyond those which accrue to the public at large.

5. Indirect costs may be included in the fee, but, defendants must first demonstrate that the indirect cost service is one which provides special benefits to plaintiffs beyond those which accrue to the public at large.

6. The completion of environmental assessments and impact statements are not services which provide special benefits to plaintiffs beyond those which accrue to the public at large.

7. The measure of a proper fee is the value to the recipient, which cannot exceed the cost to the agency for a chargeable service.

8. To be valid, the fees must bear a reasonable relationship to the costs of the agency.

9. The Independent Offices Appropriation Act and the Public Land Administration Act are not violated by charges for otherwise proper costs expended prior to the effective date of the reimbursement regulations or prior to the filing of an application.

10. Defendants and their subordinates and agents are hereby enjoined from enforcing the reimbursement regulations to the extent that they exceed the authority provided by the Independent Offices Appropriation Act or the Public Land Administration Act.

11. Defendants and their subordinates and agents shall comply with the terms of 43 C.F.R. § 2802.1–2(a)(8) to the extent of any excess payments made by plaintiffs.

The Clerk of the Court shall enter appropriate judgment. Each party shall pay its own costs.

This memorandum opinion and order constitutes our findings of fact and conclusions of law.