SOHIO TRANSPORTATION COMPANY

v.

The UNITED STATES.

No. 134–82L.

United States Claims Court.

June 12, 1984.

---

Quinn O'Connell, Washington, D.C., for plaintiff; Maryann Armbrust, Washington, D.C., of counsel.

Steven A. Herman, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant; Marcia Lipson, Washington, D.C.,of counsel.

## OPINION

YOCK, Judge.

This case presents the question of whether, and to what extent, the Department of the Interior's Bureau of Land Management (BLM) may charge the plaintiff-applicant the costs incurred by the Federal Government in processing the plaintiff's application for an oil pipeline right-of-way over federal land.[1]

Both parties have moved for summary judgment. For the reasons hereafter discussed, the defendant's motion for summary judgment is granted, and the plaintiff's motion is denied.

*Facts*

Due to the projected completion of the Trans-Alaska Oil Pipeline System in 1977, oil industry analysts determined that a surplus of crude oil would exist on the west coast of the United States. Consequently, the Standard Oil Company of Ohio (Sohio) decided to construct a crude oil pipeline system that would carry Alaskan and other crude oil from a terminal facility at Long Beach, California to Midland, Texas. In September 1975, Sohio formed the Sohio Transportation Company, the plaintiff herein, as a wholly-owned subsidiary in order to secure all necessary authorizations to build and operate the pipeline.

Because the proposed oil pipeline would cross some 17 miles of federal land, it was necessary to obtain a right-of-way permit across that land from the Department of the Interior under section 28 of the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 185 (1976). On September 11, 1975, the plaintiff filed an application for a right-of-way with BLM pursuant to section 28 of

the Act. The application was filed with the Sacramento, California office of the BLM, and was assigned file No. CA–3242. With the application, the plaintiff enclosed a check for $2,000 payable to the "Bureau of Land Management, Department of the Interior."

On February 11, 1976, BLM notified the plaintiff of the approximate costs of processing the application and also informed plaintiff of the need for an Environmental Impact Statement (EIS): "The Bureau plans, at this time, to prepare an in-house environmental impact statement * * *. We estimate our total costs for preparing the impact statement and processing the applications to be in the vicinity of $3.4 million." The EIS was a statutorily required component of the application for the right-of-way across federal land. *See* National Environmental Policy Act of 1969 § 102(2)(C), Pub.L. No. 91–190, 83 Stat. 852, 853 (1970) (codified as amended at 42 U.S.C. § 4332(2)(C) (1976)) (NEPA). On March 23, 1976, the plaintiff submitted the first of a number of payments to BLM in the amount of $57,206.34 as its initial advance requirement for processing the application.

On September 29, 1976, the plaintiff and the Secretary of the Interior signed an agreement (Agreement) which provided in part:

(A) Applicant shall reimburse the United States for all administrative costs and other costs, including direct costs and incremental direct costs, presently estimated per attached Schedule A incurred by the Department for processing the application, PROVIDED, that the Department shall endeavor to avoid unnecessary employment of personnel and needless expenditure of funds. * * * The Applicant shall reimburse the Department for all property directly purchased by the Department for the processing of these applications, Insofar as any property purchased by the Depart-

---

[1] This case is one of several within the Court that challenges the validity of the Department of the Interior's cost-reimbursement regulations.

*Alyeska Pipeline Service Co. v. United States,* No. 209–81L; *Alaskan Arctic Gas Pipeline Co., et al. v. United States,* No. 236–79C.

ment for this purpose may have a useful life extending beyond the processing period of these applications, Applicant shall reimburse the Department for such property only to the extent of the ratable share of the total useful life of such property actually expended in the processing of these applications.

(B) Applicant acknowledges that the Department has employed or may employ one or more independent consultants, contractors and subcontractors and also has utilized and may utilize personnel and services of other agencies to assist in the preparation of an environmental impact statement relating to the applications. The Secretary shall notify Applicant in writing of the employment of such consultants, contractors and subcontractors and shall inform the Applicant in writing of the purpose of such employment, the scope of the work to be undertaken, the duration of the employment and the estimated cost thereof; PROVIDED, HOWEVER, this notice requirement shall not limit the authority of the Secretary to enter into agreements with consultants, contractors or subcontractors. Costs incurred by the Department in connection with the employment of consultants, contractors and services of other agencies shall be included in the costs for which the Department is to be reimbursed by Applicant under the provisions of Paragraph (A) hereof.

A breakdown of total projected costs for the EIS preparation was attached to the Agreement as Schedule A. The general breakdown was as follows: 1) salaries for 38 permanent positions and 8 man-years of temporary personnel—$1,200,000; 2) Corps of Engineers reimbursement—$365,000; 3) consultant contracts—$430,000; 4) space—$105,000; 5) other costs such as printing, travel—$400,000.

The Agreement also allowed the plaintiff to audit Interior's records, and it provided a procedure by which disputes over charges would be resolved:

(G) If, after auditing the Department, Applicant decides to dispute any item of any statement that has been rendered,

applicant shall give the Secretary or his representative written notice of each item that is disputed, accompanied by a detailed explanation of its objection. Within thirty (30) days after notice of a disputed item or after notice of the completion of the audit, as the case may be, the Secretary or his representative and applicant shall meet to discuss, and attempt to resolve, all items which are disputed or which have not been resolved by the audit. If at that time they are unable to resolve all such items, Applicant may appeal any unresolved items to the Secretary. Any decision of the Secretary, with respect to any such appeal, shall constitute the final administrative decision of the Department. Any item that Applicant successfully disputes or appeals shall be refunded to the Applicant. In addition, if the audit discloses that the Applicant has overpaid the Department, all overpayments shall be promptly refunded to the Applicant.

On June 5, 1974, Sohio wrote the Secretary of the Interior (then the Honorable Rogers C.B. Morton) informing him that Sohio in particular and the oil industry in general believed it economically advisable and in the public interest to have an oil pipeline from the West Coast to Texas. From that point in time, up to September 29, 1976, when Sohio and the Secretary signed the pipeline Agreement at issue herein, the parties to the Agreement held numerous meetings, conversed on the telephone innumerable times and exchanged many letters fleshing out the Agreement that was to be signed. Thereafter, pursuant to statute, regulation and the signed Agreement, BLM charged the plaintiff for various costs incurred in processing the application. The plaintiff paid the assessed costs without protest.

On November 15, 1976, BLM completed the draft EIS. On May 27, 1977, the final EIS for the Sohio project was completed by BLM and filed with the Council on Environmental Quality. In July 1978, Interior issued the right-of-way permit.

On December 31, 1979, pursuant to the terms of the Agreement, the plaintiff filed a notice of disputed items with the BLM State Director in Sacramento, California. The disputed items were alternative claims for a refund: 1) that BLM lacked the appropriate statutory authority to charge the plaintiff the $2,665,698.73 in expenses incurred in preparing the EIS; or 2) if the EIS costs were properly reimbursable, then BLM incorrectly billed the plaintiff in the amount of $681,433.96. Of this latter amount, plaintiff asserted that some $465,346.78 was attributable to ongoing middle-level management costs of the BLM (referred to by plaintiff as "markup costs"). The remaining $216,088.18 represented various other expenses which plaintiff believed were not properly attributable to the EIS. On February 26, 1981, the State Director issued his decision and denied entirely the claim that BLM lacked authority to seek reimbursement of EIS costs. The Director did, however, allow a refund of $174,087.12 of the $681,433.96 claimed on the second alternate claim. The bulk of this refund—$170,932.23—was attributable to plaintiff's "markup" claim.

On March 27, 1981, the plaintiff appealed pursuant to the Agreement to the Secretary of the Interior that part of the State Director's decision regarding the authority of BLM to charge EIS preparation costs to plaintiff. The plaintiff did not appeal to the Secretary the other items in the second alternate claim for which a refund was not allowed. On January 13, 1982, the Secretary of the Interior (Acting) took the final step in the administrative process by affirming the State Director's decision.

On March 12, 1982, the plaintiff initiated this action in the United States Court of Claims seeking review of the Acting Secretary's decision on its EIS claim as well as the State Director's decision on the other disputed costs.[2] The parties have filed cross motions for summary judgment, and oral argument was held.

*Discussion*

In its complaint before this Court, the plaintiff asserts two alternate claims. Initially, plaintiff seeks a judgment of $2,494,766.70 for the amount plaintiff paid Interior to prepare the EIS. Alternatively, the plaintiff seeks to recover $294,414.55 which allegedly represents ongoing management expenses of the BLM and not costs attributable to the preparation of the EIS.[3]

In its motion for summary judgment, plaintiff seeks a judgment in the amount of $2,494,766.70, which sum represents the total amount (less $170,932.23 previously refunded) that plaintiff paid the BLM to reimburse for the EIS preparation costs. Although plaintiff's motion is not a model of clarity, it also appears that plaintiff seeks a judgment that it is entitled to recover any fees paid to the BLM which this Court determines (in subsequent proceedings) to have been excessive or unrelated to the actual cost of processing plaintiff's right-of-way application. This latter claim will be discussed in section C of this opinion.

In support of its motion for summary judgment, plaintiff presents three arguments. First, plaintiff argues that the amounts collected by the BLM were not permissible fees charged to recover costs the agency incurred in conferring a special benefit upon an identifiable beneficiary. Rather, plaintiff asserts, the amounts charged for EIS preparation were unconstitutional taxes because they reimbursed the agency for the cost of providing a service which benefited the public at large. Because the power to tax is reserved solely to the legislature, plaintiff asserts, the BLM had no authority to require plaintiff to reimburse the costs associated with EIS preparation. Second, plaintiff challenges the BLM's authority to seek reimbursement of

---

2. The case was transferred to the United States Claims Court on October 1, 1982. *See* Federal Courts Improvement Act § 403(d), Pub.L. No. 97–164, 96 Stat. 25, 58.

3. This amount represents the difference between plaintiff's original markup claim ($465,346.78) and the amount attributable to markup costs which the State Director refunded to plaintiff ($170,932.23).

EIS preparation costs on the ground that the amounts assessed were not prescribed by regulation. Third, plaintiff argues that the decision of the United States District Court for the District of Colorado in *Public Service Co. v. Andrus*, 433 F.Supp. 144 (D.Colo.1977) collaterally estops defendant from asserting that EIS preparation costs are properly reimbursable.

In its cross-motion for summary judgment, the defendant argues that the Government's position of demanding reimbursement is legally correct. The United States, defendant asserts, is entitled to reimbursement for the costs of preparing an EIS because such reimbursement is provided for by appropriate regulation and does not resemble an unconstitutional tax. Additionally, the defendant contests the plaintiff's assertion that the United States is collaterally estopped from arguing the legality of the EIS reimbursement scheme. Finally, the defendant asserts that the Court should dismiss the plaintiff's second, alternate claim as contained in its complaint, and any claim for excessive costs charged for the EIS as apparently asserted for the first time in its motion for summary judgment, because the plaintiff failed to exhaust its administrative remedies.

In the context of a motion for summary judgment, a court must determine as a threshold matter whether a genuine issue of material fact exists. *Johnson Controls, Inc. v. United States*, 1 Cl.Ct. 256, 257 (1982); *Garcia v. United States*, 123 Ct.Cl. 722, 732, 108 F.Supp. 608, 613 (1952). Moreover, any doubts, inferences, or issues of credibility must be resolved against the moving party. *See Housing Corporation of America v. United States*, 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). Thus, "where there is the slightest doubt as to the facts" the motion for summary judgment will be denied. *Tomalewski v. State Farm Insurance Co.*, 494 F.2d 882, 884 (3d Cir.1974). In the present case, both parties have moved for summary judgment and both parties have indicated that the facts are clear and not in dispute. The Court agrees and, therefore, the motions for summary judgment may be examined.

## A. Reimbursement of EIS Costs

### 1. *The Statutory Framework*

The general authority for federal agencies to seek reimbursement of expenses incurred in issuing permits or licenses is found in the Independent Offices Appropriation Act (IOAA), Pub.L. No. 82–137, 65 Stat. 290 (1951) (formerly codified at 31 U.S.C. § 483a (1976), recently recodified at 31 U.S.C. § 9701 (1982)).

The IOAA provides in pertinent part:
It is the sense of Congress that any * * * license, permit, * * * or similar thing of value or utility performed, furnished, provided, granted, prepared or issued by any Federal agency * * * to or for any person * * * shall be selfsustaining to the full extent possible, and the head of each Federal agency is authorized by regulation * * * to prescribe therefor such fee, charge, or price, if any, as he shall determine * * * to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts * * *.

The Mineral Leasing Act of 1920 (MLA), codified as amended at 30 U.S.C. §§ 181–227 (1982), contains the specific authorization for the Department of the Interior to grant rights-of-way for oil and gas pipelines across federal lands. At all times pertinent, the MLA contained a cost-reimbursement provision which stated: "The applicant for a right-of-way or permit shall reimburse the United States for administrative and other costs incurred in processing the application * * *." 30 U.S.C. § 185(*l*) (1976). Absent from the MLA is an express requirement that cost reimbursement must be provided for by regulation. The Court of Claims addressed this omission in *Alyeska Pipeline Service Co. v. United States*, 224 Ct.Cl. 240, 624 F.2d 1005 (1980). The court determined that Congress, in amending the MLA, did not intend to override the requirement of the IOAA that reimbursement of expenses be authorized by regulation. *Id.* at 250, 624 F.2d at 1011.

Despite the directive of Congress when the IOAA was first enacted in 1950 that the Government could seek reimbursement of expenses only pursuant to regulation, it was not until 1975 that Interior first promulgated regulations providing for reimbursement of expenses incurred in processing right-of-way applications. *See* 40 Fed. Reg. 17,842 (1975). These regulations, which became effective June 1, 1975, state in pertinent part:

(a)(1) An applicant for a right-of-way or a permit incident to a right-of-way shall reimburse the United States for administrative and other costs incurred by the United States in processing the application, including the preparation of reports and statements pursuant to the National Environmental Policy Act (42 U.S.C. 4321–4347), before the right-of-way or permit will be issued under the regulations of this part.

\* \* \* \* \* \*

(4) When an application is received, the authorized officer shall estimate the costs expected to be incurred by the United States in processing the application. If, in the judgment of the authorized officer, such costs will exceed the paragraph (a)(3) of this section, payment by an amount which is greater than the cost of maintaining actual cost records for the application review process, the authorized officer shall require the applicant to make periodic payments of the estimated reimbursable costs prior to the incurrence of such costs by the United States. Such payments may be refunded or adjusted as provided by paragraph (a)(8) of this section.

(5) Prior to the issuance of any authorization for a right-of-way or permit incident to a right-of-way, the applicant will be required to pay additional amounts to the extent the costs of the United States have exceeded the payments required by paragraphs (a)(3) and (4) of this section.

\* \* \* \* \* \*

(9) The authorized officer shall on request give an applicant or a prospective applicant an estimate, based on the best available cost information, of the costs which would be incurred by the United States in processing an application. However, reimbursement will not be limited to the estimate of the authorized officer if actual costs exceed the projected estimate.

43 C.F.R. § 2802.1–2 (1975).

### 2. *Plaintiff's Tax vs. Fee Contention*

The primary focus of this case is whether the BLM may charge plaintiff for EIS preparation costs pursuant to Interior's cost-reimbursement regulations. Initially, however, the Court must inquire whether and to what extent the costs of environmental impact studies which are triggered by applications for rights-of-way may be assessed to individual applicants. Before this Court, plaintiff has contended that under applicable Supreme Court precedent the BLM may not charge to a right-of-way applicant any costs of conducting an EIS required by the National Environmental Policy Act.

As written, the IOAA confers upon each federal agency a broad grant of authority to set fees for services provided by the agency to "any person." The Act provides that in setting fees, the agency shall consider not only the "direct and indirect cost to the Government" and the "value to the recipient," but also the "public policy or interest served, and other pertinent facts." In the companion cases of *National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) (*National Cable I*), and *FPC v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974) (*New England Power*), the Supreme Court addressed concerns that the broad grant of authority contained in the IOAA amounted to an unconstitutional delegation of the taxing power.

Initially, the Court observed that taxation is exclusively a legislative function. Congress, as the "sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay,

based on property or income." *National Cable I, supra,* 415 U.S. at 340, 94 S.Ct. at 1148. The Court observed, however, that a fee, unlike a tax, is "incident to a voluntary act. * * * The public agency performing [a service] normally may exact a fee for a grant which, presumably, bestows a benefit upon the applicant not shared by other members of society." *Id.*

■ Reading the IOAA narrowly so as not to run afoul of the Constitution, the Court concluded that the Act confers upon agencies only the authority to assess fees to recover the direct and indirect costs incurred in providing services which confer a special benefit upon an "identifiable recipient." *New England Power, supra,* 415 U.S. at 343, 94 S.Ct. at 1150; *National Cable I, supra,* 415 U.S. at 351, 94 S.Ct. at 1155. The fees an agency assesses, the Court observed, should reflect the value of the service provided to the recipient, rather than any considerations of public policy. *National Cable I, supra,* 415 U.S. at 341, 344, 94 S.Ct. at 1149–50. Had the Court not read the IOAA narrowly, the Act's cost-reimbursement provision would have amounted to an unconstitutional delegation by Congress of the taxing power in violation of Article I, § 8, cl. 1 of the Constitution. *Id.* at 340–42, 94 S.Ct. at 1148–49; *see also Bunge Corp. v. United States,* 5 Cl.Ct. 511, at 517–18 (Cl.Ct.1984). Thus, an agency of the United States may only assess fees to recover costs incurred in conferring special benefits—those not shared by the public at large—upon identifiable beneficiaries.

Subsequently, a number of federal courts examined the issue of reimbursement of EIS costs in light of the Supreme Court's decisions in *National Cable I* and *New England Power.* In *Public Service Co. v. Andrus,* 433 F.Supp. 144 (D.Colo. 1977), the United States District Court for the District of Colorado considered a claim that the statutes authorizing Interior to obtain cost reimbursement constituted an unconstitutional delegation of the taxing power. The court observed that, under *National Cable I,* the proper measure of a fee is the value of the conferred benefit to the recipient. *Id.* at 153; *see National Cable I, supra,* 415 U.S. at 340–41, 94 S.Ct. at 1148–49. In determining to whom the benefit of an EIS flowed, the court concluded:

> It is without serious question that the National Environmental Policy Act of 1969 * * *, which requires the promulgation of environmental analyses and impact statements, was enacted for the primary benefit of the general public. The declared purpose of the Act was to foster a national policy encouraging productive and enjoyable harmony and balance between man and his environment * * *. Thus, it is suggestive that the environmental reports which result from the normal processing of a right of way application are not services rendered for the special benefit of the applicant.

433 F.Supp. at 152. Accordingly, the court held that "[t]he costs of environmental analyses and impact statements developed pursuant to the mandate of the National Environmental Policy Act are not of primary benefit to the right of way applicant, and thus cannot properly be charged as fees under either the [IOAA or Public Land Administration Act]." *Id.* at 153.

In *Mississippi Power & Light Co. v. NRC,* 601 F.2d 223 (5th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980), the Fifth Circuit Court of Appeals considered whether *National Cable I* and *New England Power* prohibited the NRC from recovering from license applicants the full cost of conducting environmental impact statements required under NEPA. Differing with the Colorado court's analysis, the Fifth Circuit court held that the NRC *could* recover all costs the agency incurred in providing a service to an identifiable beneficiary of that service, regardless of whether incidental benefit flowed from the provision of the service to the public. *Id.* at 230. In so holding, the court stated:

> We uphold the Commission's authority to charge a fee for such reviews because

they are a prerequisite to the issuance of a license. It matters not that the legal obligation of preparing environmental impact statements rests with the NRC; nor is the Commission's authority to assess such fees undercut by the obvious public benefit flowing from the preparation of these environmental reviews. The Commission must conduct these reviews before it can issue a license to an applicant; it is a necessary part of the cost of providing a special benefit to the licensee. In other words, it is "incident to a voluntary act." Because the Commission may recoup the *full cost* of conferring a special benefit, it may recover its costs for conducting environmental reviews.

*Id.* at 231 (emphasis in original).

In 1979, the Tenth Circuit considered and rejected the contention that the Department of the Interior may not seek reimbursement for any portion of the cost of EIS preparation. In *Alumet v. Andrus,* 607 F.2d 911 (10th Cir.1979), the court considered whether the BLM could charge the plaintiff for EIS preparation costs mandated by the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1701–1782 (1976). The court declined to accept the argument of the plaintiff that the benefit of an EIS inures solely to the public and that no portion of the cost is assessable to the applicant. The Tenth Circuit court held, therefore, that FLPMA required that reasonable costs incurred in processing an application, including EIS costs, could be charged to the applicant. *Id.* at 916.

Finally, in *Nevada Power Co. v. Watt,* 711 F.2d 913 (10th Cir.1983), the Tenth Circuit again addressed the question of the recovery of EIS costs. The court made it clear that Interior could charge EIS preparation costs to the applicant:

The charges for environmental impact statements at issue in this case represent the costs of studies required by law to be performed when an application triggers NEPA. * * * These studies are a necessary prerequisite to the receipt by the applicant of a "special benefit," the grant

of a right-of-way. Therefore, Interior is not restrained by the doctrine laid out in *National Cable* and *New England Power Co.* from charging the full cost of such an EIS to the applicant.

*Id.* at 930 (citations omitted); *see Mississippi Power and Light Co., supra,* 601 F.2d at 231.

■ This Court believes that the reasoning of the Tenth Circuit in *Nevada Power* and *Alumet,* and of the Fifth Circuit in *Mississippi Power & Light,* is persuasive and that *National Cable I* and *New England Power* do not bar the EIS reimbursement concept. Although some incidental benefit clearly flows to the public when Interior conducts an EIS in conjunction with the processing of a right-of-way application, it is equally clear that the primary and special benefit—the grant of a right-of-way across federal land—flows to an identifiable ultimate beneficiary: the applicant. The plaintiff's application for a right-of-way permit was a voluntary act which sought a valuable benefit in the form of governmental permission to cross federal land. Had plaintiff not sought that right-of-way, Interior would not have undertaken to conduct an EIS and no costs would have been incurred. BLM's assessment of the EIS costs to right-of-way applicants in the form of fees was proper, and BLM could assess the full costs to the plaintiff. The charges were not taxes.

3. *Plaintiff's Challenge to Interior's Cost-Reimbursement Regulations*

Having concluded that, as a general matter, Interior may properly seek reimbursement from right-of-way applicants for the full cost of conducting an EIS triggered under NEPA, it is necessary to determine the validity of Interior's cost-reimbursement regulations. Plaintiff contends correctly that the Secretary of the Interior may seek reimbursement of expenses only pursuant to validity promulgated regulations. According to plaintiff's interpretation of the IOAA, however, Interior must set forth, in the form of a schedule or table, the amount of the fees which the

agency may charge for processing right-of-way applications. In its brief in support of its motion for summary judgment, plaintiff argues that "on its face, 31 U.S.C. § 483a requires agencies to list in their regulations any fees that are to be charged." [4] At oral argument on plaintiff's motion, however, counsel retreated from this position somewhat and urged instead that the regulations should, at a minimum, provide some formula with which an applicant may calculate the charges for which it ultimately will be liable. Because the regulations do not do this, plaintiff contends they are totally defective and plaintiff is entitled to a refund of the full amount paid to Interior to reimburse the cost of EIS preparation in connection with the processing of plaintiff's right-of-way application.

Defendant responds by arguing that the Secretary of the Interior is authorized by the regulations found at 43 C.F.R. § 2803.-1–1 (1981) (formerly section 2802.1–2 (1975)) to assess to an applicant the costs, including the cost of conducting an EIS, incurred in processing an application for a right-of-way across federal land. Defendant urges that the Secretary's regulations implement the will of Congress and should be upheld.

■ Normally an administrative interpretation of a congressional grant of authority is to be accorded substantial deference by a reviewing court. Such interpretations of statutory authority are entitled to important, but not controlling, significance. *Batterton v. Francis*, 432 U.S. 416, 424, 97 S.Ct. 2399, 2404, 53 L.Ed.2d 448 (1977). This is particularly true when Congress expressly delegates to an administrative body the authority to prescribe standards for agency action. *Id.* at 425, 97 S.Ct. at 2405. A court reviewing an agency's exercise of rule-making authority may not freely set aside a regulation unless the agency exceeded its authority in promulgating the regulation or unless the regulation itself is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 425–26, 97

S.Ct. at 2405–06; *see* 5 U.S.C. § 706(2)(A) & (C) (1982). The Supreme Court has noted:

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.

*Manhattan General Equip. Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); *Dixon v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965). This Court's predecessor recognized this principle as well, observing that "only if [a regulation] clearly contradicts the terms or purposes of the statute" may the Court invalidate that regulation. *Port Authority of St. Paul v. United States*, 193 Ct.Cl. 108, 115, 432 F.2d 455, 458 (1970); *see also Fix v. United States*, 177 Ct.Cl. 369, 377, 368 F.2d 609, 614 (1966).

■ The question to be resolved, therefore, is whether Interior's cost-reimbursement regulations exceed the agency's delegated authority or otherwise violate the principles set forth above.

This is not the first time Interior's authority to recover costs pursuant to its cost-reimbursement regulations has been challenged. In *Nevada Power Co. v. Watt, supra,* the Tenth Circuit considered three consolidated appeals which contested Interior's right to seek reimbursement of costs they incurred in processing applications for rights-of-way under the Federal Land Policy and Management Act of 1976. Although the decision of the Tenth Circuit turned, for the most part, on an analysis of

---

**4.** 31 U.S.C. § 483a has recently been recodified at 31 U.S.C. § 9701 (1982).

FLPMA, the Court's well-reasoned analysis of Interior's regulations is instructive.[5]

FLPMA, which became effective in October of 1976, sets forth a comprehensive policy for the management of public lands. *Nevada Power Co., supra,* 711 F.2d at 917 n. 2; *see* FLPMA, 43 U.S.C. § 1701 (1976) (congressional declaration of policy). Pursuant to FLPMA, the Secretary of the Interior is directed to promulgate rules and regulations to carry out the declared purposes of the Act. 43 U.S.C. § 1740. With regard to cost reimbursement, FLPMA directs the Secretary to promulgate rules and regulations which provide for reimbursement of costs which the Government incurs in processing right-of-way applications:

> The Secretary * * * may, by regulation or prior to promulgation of such regulations, as a condition of a right-of-way, require an applicant for or holder of a right-of-way to reimburse the United States for all reasonable administrative and other costs incurred in processing an application for such right-of-way and in inspection and monitoring of construction, operation, and termination of the facility pursuant to such right-of-way * * *.

*Id.* § 1764(g) (1976). Congress provided additional guidance to the Secretary in section 304 of the Act:

> (a) Authority to establish and modify
>
> Notwithstanding any other provision of law, the Secretary may establish reasonable filing and service fees and reasonable charges, and commissions with respect to applications and other documents relating to the public lands and may change and abolish such fees, charges, and commissions.
>
> (b) Deposits for payments to reimburse reasonable costs of United States
>
> The Secretary is authorized to require a deposit of any payments intended to

reimburse the United States for reasonable costs with respect to applications and other documents relating to such lands. * * * As used in this section "reasonable costs" include, but are not limited to, the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities. In determining whether costs are reasonable under this section, the Secretary may take into consideration actual costs (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

FLPMA § 304, 43 U.S.C. § 1734 (1976). Interior, on September 29, 1977, promulgated Secretarial Order No. 3011, providing: "The regulations at 43 C.F.R. 2802.1–2 (1976) shall be applicable to * * * applications [under section 304 of FLPMA] * * * until new regulations implementing Title V of FLPMA become final." 42 Fed.Reg. 55,280 (1977). Thereafter, Interior reissued its reimbursement regulations. 45 Fed.Reg. 44,532 (1980). The reissued regulations were renumbered as 43 C.F.R. § 2803.1–1 and were substantially similar to the regulations under consideration in the instant case.

The plaintiffs in the three consolidated cases which comprised *Nevada Power* on appeal were electric utilities that sought rights-of-way across federal lands. In each case, the Bureau of Land Management charged the utilities for costs which BLM

---

5. The relevant authority for Interior to grant rights-of-way for oil or gas pipelines is found in section 185(*l*) of the Mineral Leasing Act. FLPMA expressly excludes from its scope rights-of-way for such products: "The Secretary * * * [is] * * * authorized to grant, issue, or renew rights-of-way over, upon, under, or through such lands for— * * * * *

"(2) pipelines and other systems for the transportation or distribution of liquids and gases, other than water and *other than oil, natural gas, synthetic liquid or gaseous fuels * * *.*" 43 U.S.C. § 1761(a)(2) (1976) (emphasis added). Neither party to this case has argued that FLPMA provided controlling statutory authorization for the right-of-way in question.

incurred in processing the individual right-of-way applications. In two of the three constituent cases, the plaintiffs brought suit in the United States District Court for the District of Colorado and in the United States District Court for the District of Utah, respectively, seeking declaratory judgment that Interior's cost-reimbursement regulations were invalid. Both courts concluded that Congress had provided mandatory standards in FLPMA which the Secretary was to consider when "determining whether costs are reasonable." Interior's regulations, both courts held, exceeded the authority of the statutory authorization because they did not adequately permit consideration of FLPMA's "reasonableness factors." *Nevada Power Co. v. Watt*, 515 F.Supp. 307, 324–25 (D.Utah 1981); *Public Service Co. v. Watt*, 711 F.2d 913 (D.Colo.).

In the third case, *Colorado-Ute Electric Ass'n, Inc. v. Watt*, 533 F.Supp. 197 (D.Colo.1982), the plaintiff utility administratively protested Interior's authority to charge to an applicant the cost of processing a right-or-way application. Following an unsuccessful administrative appeal of the denial of its claim, Colorado-Ute sought judicial review in the United States District Court for the District of Colorado. The district judge, analyzing the regulations in light of FLPMA, concluded that the Act contained a discretionary directive that the Secretary consider various statutory "reasonableness factors" when assessing costs to a right-of-way applicant. Accordingly, the judge held that Interior's regulations did not exceed the statutory authorization found in FLPMA. *Id.* 200–01.

On appeal, the Tenth Circuit Court of Appeals observed that the issue common to all three cases was whether the statutory language of section 304(b) of FLPMA, which provided that the Secretary "may * * * consider" certain factors, was mandatory or discretionary. 711 F.2d at 919. If the statutory directive was mandatory, the court observed, the next inquiry was whether Interior's regulations adequately reflected the statutory "reasonableness factors." An exhaustive review of the legislative history of FLPMA led the *Nevada Power* court to conclude that FLPMA contained a mandatory directive. *Id.* at 925. The court noted:

Our review of this unusually abundant legislative history reinforces our conclusion that the reasonableness factors were intended to limit the Secretary's authorization to charge reasonable costs. The factors were added to ensure that applicants would not as a matter of course bear all of the costs occasioned by their application. * * * The congressional intent expressed by the inclusion of the reasonableness factors is aptly summarized in the conferees' report: "The conferees wrote into the bill factors *to be considered* by the Secretary in determining whether charges are in fact reasonable." H.R.Conf.Rep. No. 1724, *supra*, at 61, U.S.Code Cong. & Ad.News 1976, p. 6233 (emphasis added). We hold that the Secretary must, when establishing reasonable costs of processing applications, consider the reasonableness factors listed in section 304(b).

*Id.* (footnotes omitted). The *Nevada Power* court found, however, that Interior's cost-reimbursement regulations did not adequately reflect the section 304(b) "reasonableness factors." *Id.* at 933. The court held, therefore, that the regulations were inconsistent with and in excess of the statutory authority of FLPMA. Accordingly, the court affirmed *Public Service* and *Nevada Power*.

The district court's decision in *Colorado-Ute* required a different analysis. In that case, the trial court had upheld Interior's regulations on the basis of its interpretation of FLPMA. The utility, however, had been granted its right-of-way in 1975, prior to the October 1976 enactment of FLPMA. The Tenth Circuit concluded, therefore, that the trial court should have determined the validity of the regulations in light of the pre-FLPMA statutory authorization for cost reimbursement. *Id.* at 932–33.

The IOAA provided the dispositive authority, and the Tenth Circuit undertook its

analysis of the validity of Interior's regulations in light of that act. The IOAA, however, provided little guidance to the court as it attempted to divine the intent of Congress. The court noted:

> Unlike FLPMA, the IOAA provides little legislative history relevant to cost reimbursement. Other than the statutory command that fees charged be "fair and equitable," * * * the IOAA reveals none of the evidence of Congressional intent that we found so compelling in construing FLPMA § 304(b).

*Id.* at 933. The court was unable to conclude that Interior's cost-reimbursement regulations were contrary to the directive of the IOAA. The court held, therefore, that "Interior may, consonant with *National Cable* and *New England Power Co.*, recover the full costs of services provided to Colorado-Ute as an identifiable beneficiary. These costs may include the full expenses of an EIS triggered under NEPA by Colorado-Ute's application." *Id.*

The analysis of the Tenth Circuit Court of Appeals in *Nevada Power* is instructive and, this Court believes, persuasive. The Tenth Circuit's comprehensive review of the legislative history of FLPMA revealed a congressional intent that Interior weigh FLPMA's "reasonableness factors" when assessing to an applicant the costs of processing a right-of-way application. Because the regulations did not permit Interior to consider FLPMA's reasonableness factors, they were contrary to congressional intent and therefore were invalid.

A different result was dictated, however, when the regulations were considered in light of the IOAA. The *Nevada Power* court was unable to find any persuasive authority which would indicate that the intention of Congress when it enacted the IOAA was other than to require agencies to promulgate regulations which provide for "fair and equitable" cost reimbursement. This Court agrees with the Tenth Circuit's analysis and holds that Interior's regulations in the case at bar are not in excess of or contrary to the congressional

mandate of cost reimbursement found in the IOAA.

This Court's conclusion that Interior's cost-reimbursement regulations do not violate the congressional intent of the IOAA does not end the inquiry. Plaintiff's right-of-way application was filed pursuant to section 185($l$) of the Mineral Leasing Act, and it is therefore necessary to consider Interior's regulations in relation to that Act.

In 1973, Congress amended section 28 of the Mineral Leasing Act of 1920. *See* Trans-Alaska Pipeline Authorization Act, Pub.L. No. 93–153, 87 Stat. 576 (1973) (codified at 30 U.S.C. § 185(a)-(y) (1983)). As mentioned previously, the MLA, as amended, provides that an "applicant for a right-of-way or permit shall reimburse the United States for administrative and other costs incurred in processing the application * *." 30 U.S.C. § 185($l$). The Act, however, does not contain any directive that reimbursement of fees be obtained pursuant to regulation. In *Alyeska Pipeline Service Co., supra,* the Court of Claims addressed this omission and, after an analysis of the legislative history of the amendments to the MLA, concluded that Congress did not intend that section 185($l$) supersede the requirement of the IOAA that reimbursement of fees be provided for by regulation. 224 Ct.Cl. at 249–50, 624 F.2d at 1010–11.

It is unnecessary to repeat the *Alyeska* court's discussion of the legislative history of the 1973 amendments to the MLA. It is worth noting, however, that neither the House version of the bill, H.R. 9130, 93d Cong. 1st Sess., H.R.Rep. No. 414, 93d Cong., 1st Sess. 2 (1973), nor the Senate version, S. 1081, 93d Cong., 1st Sess., S.Rep. No. 207, 93d Cong., 1st Sess. 6 (1973), U.S.Code Cong. & Admin.News 1973, 2417, contained any directive which specified the procedures by which Interior was to obtain reimbursement of right-of-way application processing costs. The conference committee version of the bill, which closely paralleled the House version, and which ultimately was enacted, also did not provide standards which Interior was to

apply in promulgating regulations for cost reimbursement. *See Alyeska Pipeline Service Co., supra,* 224 Ct.Cl. at 257–58, 624 F.2d at 1012–13.

Unlike FLPMA, where Congress chose to provide comprehensive standards to guide the Secretary's actions, the MLA is silent as to factors Interior shall take into account when assessing the costs of processing a right-of-way application. The only indication this Court has found which would indicate that Congress intended that Interior promulgate a more comprehensive regulatory scheme is found in a remark of Senator Jackson during debate on the conference committee bill. When asked whether reimbursable costs included only the direct and identifiable costs of application processing and monitoring of pipeline construction, Senator Jackson responded affirmatively, noting:

> The conferees contemplate that the Secretary will promulgate regulations establishing a schedule for reimbursement according to standards which are fair and equitable and as uniform as practicable, taking into consideration the direct and indirect cost to the Government, the value to the recipient, the public policy in public interest served and other pertinent facts.

119 Cong.Rec. 36,814 (1973). Significantly, the Senator's remarks parallel, almost verbatim, the language found in the IOAA. *See* 31 U.S.C. § 483a (1976).

The *Nevada Power* court invalidated Interior's regulations as they apply to FLPMA, but concluded that the same regulations do not violate the statutory purpose of the IOAA. *See Nevada Power Co., supra,* 711 F.2d at 933. This Court agrees and, further, is unable to conclude that Interior's cost-reimbursement regulations do violence to the statutory intent of Congress as it is reflected in section 185(*l*) of the MLA, which draws its rationale for reimbursement from the provisions of the IOAA. *Cf. Alyeska Pipeline Service Co., supra,* 224 Ct.Cl. at 250, 624 F.2d at 1011 (section 185(*l*) does not override IOAA but merely obligates applicant to reimburse the

Government). Only if a regulation clearly contradicts the terms and purposes of the enabling legislation may we hold the regulation invalid. *Port Authority of Saint Paul v. United States,* 193 Ct.Cl. 108, 115, 432 F.2d 455, 458 (1970); *Fix v. United States,* 177 Ct.Cl. 369, 377, 368 F.2d 609, 614 (1966). This Court is unable to conclude that Interior's regulations contradict the statutory purpose of either the IOAA or the MLA.

### 4. *Specificity of Interior's Regulations*

As noted previously, plaintiff has attacked Interior's regulations on the grounds of specificity. In other words, it is plaintiff's contention that the regulations fail either to specify the actual fees to be charged or to provide a formula with which the fees may be calculated. Plaintiff relies upon two decisions of the Court of Appeals for the District of Columbia Circuit and a decision of the Second Circuit in support of its assertion that the IOAA mandates that reimbursable fees be set forth with some particularity. In *National Cable Television Ass'n v. FCC,* 554 F.2d 1094 (D.C. Cir.1976) (*National Cable II*), and *Electronic Industries Ass'n v. FCC,* 554 F.2d 1109 (D.C.Cir.1976), the D.C. Circuit elaborated upon the public vs. private benefit distinction which the Supreme Court addressed in *National Cable I* and *New England Power Co.* In both *National Cable II* and *Electronic Industries,* the Court reviewed fee schedules that the FCC had promulgated pursuant to the IOAA. In each instance, the Court found that the fee schedules had the effect of assessing to individual members of an entire industry the cost to the FCC of regulating that industry. In *National Cable II,* the court observed:

> [T]he IOAA gives the agency no authority to charge for general activities which independently benefit the public at large * * *. Thus, the FCC is required to show the particular costs which they are assessing against the recipients so as to assure that they are paying only for the specific expenses which are incurred in

connection with the service of granting them their operating authority. 554 F.2d at 1104–05. The court went on to note: "This was not done here, and thus we cannot conclude * * * that the 1975 annual authorization fee has been formulated in a manner consistent with the requirements of the IOAA." *Id.* at 1105. In *Electronic Industries,* the court stated: "[W]e interpret the statute and the Supreme Court decisions to require reasonable particularization of the basis for the fees, accomplished by an allocation of cost to the smallest unit that is practical." 554 F.2d at 1116.

In the Second Circuit case, *Diapulse Corp. v. FDA,* 500 F.2d 75 (2d Cir.1974), the plaintiff challenged the authority of the Food and Drug Administration to assess a fee of $103.60 per day to reimburse the cost of screening and deleting material exempt from disclosure under the Freedom of Information Act. The regulation upon which the FDA relied provided:

> (a) Certain routine information is provided to the general public at no charge; however, special informational services involving more than routine investigation and allocation of staff time are subject to fees as necessary to recover costs to the government.

21 C.F.R. § 2.115(2) (1973). Holding that the regulation did not authorize the fee charged, the court observed: "The FDA's interpretation of § 2.115(a) would turn it into general authority to charge any fee for any service it renders to a private citizen. We think that the requirement of [the IOAA] that fees be authorized by regulation requires that the regulations be more specific than this." *Diapulse Corp., supra,* 500 F.2d at 79.

Plaintiff's reliance on these cases is misplaced. Reimbursement regulations promulgated pursuant to the IOAA need not set forth a particularized fee schedule for the sake of form alone. Rather, the concern of the D.C. Circuit in *National Cable II* and *Electronic Industries* was that the FCC's assessment of fees comport with the principles established by the Supreme Court in *National Cable I* and *New England Power.* In both cases, the FCC's fee schedules did not reflect the "value to the recipient" standard required by the Supreme Court. Instead, the FCC had sought to recover in fees exacted from members of an industry, the costs of regulating that industry. *National Cable II, supra,* 554 F.2d at 1105; *Electronic Industries, supra,* 554 F.2d at 1113. Because the IOAA grants agencies authority only to recover expenses incurred in rendering specific services to identified beneficiaries, the D.C. Circuit concluded that the FCC must be more explicit in setting forth the cost basis for its fees.

The case presently before this Court is distinguishable. Interior did not seek to recover from Sohio Transportation Company the cost of regulating an entire industry. Rather, the agency sought to recover the cost of conferring an enormously valuable benefit—the grant of a right-of-way for an oil pipeline—upon an identifiable beneficiary. There was no danger of the agency "charg[ing] for general activities which independently benefit the public at large." *National Cable II, supra,* 554 F.2d at 1104. Nor did Interior's regulations grant the agency "general authority to charge any fee for any service." *Diapulse Corp., supra,* 500 F.2d at 79. Interior was limited to recovering only the costs of processing the individual right-of-way applications, including the cost of conducting an EIS. And, under the Agreement plaintiff entered into with BLM, it was free to dispute any costs plaintiff believed to be excessive or unrelated to the application.

Both the Fifth and Tenth Circuits have held that the rules established by the Supreme Court in *National Cable I* and *New England Power* do not bar Interior from charging to right-of-way applicants the *full* cost of conducting an EIS. *Nevada Power Co., supra,* 711 F.2d at 933; *Mississippi Power & Light Co., supra,* 601 F.2d at 230. Indeed, the Fifth Circuit rejected an argument that the agency should exclude from its fees the value of any incidental benefit which flows to the public. The court ob-

served that assessing the full costs of providing a service to an identifiable beneficiary (the applicant) "comports with the clear legislative intent that agencies be 'self-sustaining to the full extent possible.' 31 U.S.C. § 483a. To impose the petitioners' allocation requirement would saddle agencies with the impossible task of sorting out public from private benefits, with the likely result that most agency fees would be reduced to mere tokens." *Mississippi Power & Light Co., supra,* 601 F.2d at 230.

Although in some circumstances the IOAA clearly requires that reimbursement regulations reflect the cost basis of a fee (for example in situations where there is a danger that fees may be assessed for services rendered to unidentifiable recipients), where, as here, there is no danger that anyone other than the beneficiary of the service will be charged, there is no need to quantify the fee in the form of a schedule of charges. Moreover, it is difficult to visualize exactly how the reimbursable costs of conducting an EIS could be quantified in advance, either in the form of a schedule of fees or with a formula.

Plaintiff refers the Court to regulations promulgated by the Nuclear Regulatory Commission as an example of a comprehensive regulatory scheme for cost reimbursement. *See* 10 C.F.R. § 170.21 *et seq.* (1981). Admittedly, the NRC regulations provide an extensive schedule of reimbursable fees. However, this schedule sets forth fees for such services as construction and application permits, *id.* § 170.21, and routine inspection fees. *Id.* § 170.32. Significantly, the NRC regulations also contain a provision for "special projects and reviews." Instead of specifying a fee or supplying a formula for calculation of the fee to be charged, the regulation provides: "Charge will be separately determined by the Commission taking into account the professional manpower required to conduct the review multiplied by the applicable cost per man-year, plus any appropriate support services costs incurred." *Id.* § 170.21 n. 4. This Court is unable to discern any substantial difference between the regulation found at 10 C.F.R. § 170.21 and Interior's cost-reimbursement regulation. Both regulations reflect an administrative recognition that certain agency costs are not susceptible of quantification through the process of legislative rulemaking.

The trial court in *Public Service Co. v. Watt* observed that "[t]he rulemaking process is a singularly inappropriate vehicle by which to achieve compliance with FLPMA." *Nevada Power Co. v. Watt, supra,* 711 F.2d at 927 (quoting *Public Service Co. v. Watt,* 711 F.2d 913 (D.Colo.)). The *Nevada Power* court was unwilling to go that far, but noted: " '[t]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.' * * * We will not dictate the process to be used by Interior in weighing the factors in section 304(b)." *Id.* (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)). The court went on: "The Department may, if it so chooses, use rulemaking as far as possible * * *, bearing in mind only that 'the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule.' " *Id.* (quoting *SEC v. Chenery Corp.,* 332 U.S. at 203, 67 S.Ct. at 1580). Indeed, in view of the unique nature of individual environmental impact studies, it is perhaps preferable for Interior to proceed on a case-by-case basis. Such an approach ensures that the applicant will be assessed at an amount neither in excess of nor less than the actual cost of conducting an EIS, thus effectuating the intent of Congress. *See Bunge Corp., supra,* 5 Cl.Ct. at 517.

A significant purpose of the requirement that Interior obtain reimbursement only pursuant to regulation is "to give applicants and permittees the opportunity to be heard before the amount of reimbursement is fixed and advance notice of the expenses they will incur if their application is granted." *Alyeska Pipeline Service Co., supra,* 224 Ct.Cl. at 262, 624 F.2d at 1018. BLM's regulations and handling of the plaintiff's

application in this case did, in fact, provide the plaintiff with adequate notice and information about the costs involved in processing this particular EIS. The regulations very clearly specified that applicants for right-of-way permits would be subject to cost reimbursement, including the costs expended for Environmental Impact Statements. In addition, the regulations spelled out that the applicants would be given estimates, based on the best available cost information, of the costs which would be incurred by the United States in processing an application. This estimate procedure, required by regulation, was followed in this case.

On June 5, 1974, the chairman of Sohio sent a letter to the Secretary of the Interior indicating Sohio's interest in constructing a pipeline. On July 31, 1975, officials of Sohio met with representatives of the BLM to discuss the pipeline further. Subsequently, on September 11, 1975, Sohio formally submitted an application for a right-of-way across federal lands.

On February 11, 1976, BLM sent the plaintiff a letter indicating the need to process the application for a right-of-way, as well as the concurrent need to prepare an EIS. In addition, the letter indicated the approximate cost of the application process:

As you are aware, Section (1) of the 1973 amendatory act, supra, and Subpart 2002 of Title 43, Code of Federal Regulations, provides for reimbursement to the United States for administrative and other costs incurred in the processing of the applications including the preparation of reports and statements pursuant to the National Environmental Policy Act (42 Stat. U.S.C. 4321–4347). The purpose of this letter is to apprise you of the Bureau's estimated cost for processing those applications pertaining to the pipeline project and to seek your concurrence in our proceeding subject to your payment of the costs incurred.

The Bureau plans, at this time, to prepare an in-house environmental impact statement with some contracts covering such areas as air quality, archeology, visual analysis, geotechniques/pipeline safety and engineering and socio-economics. We estimate our total costs for preparing the impact statement and processing the applications to be in the vicinity of $3.4 million.

On January 21, 1977, the plaintiff signed an Agreement to reimburse the defendant for costs incurred in processing the application and preparing the EIS. Also attached to the Agreement was a breakdown of the total projected cost of the EIS:

Primary components of the total project costs are:

| | |
|---|---|
| Salaries for 38 permanent positions and 8 man-years of temporary hires | $1,200,000 |
| Corps of Engineers Reimbursements | 365,000 |
| Consultant Services Contracts | 430,000 |
| Space | 105,000 |
| Other Costs including printing, travel, aerial photos, etc. | 400,000 |
| Total | $2,500,000 |

Finally, on May 27, 1977, Interior completed the EIS and provided the plaintiff with a copy. The EIS included a breakdown of specific costs charged to the plaintiff.

In short, BLM notified plaintiff of the need for reimbursement. Additionally, BLM gave plaintiff an estimate of the total cost and also provided a general breakdown of the costs involved in the project. Moreover, all of this information was available to plaintiff before it voluntarily signed the Agreement. The plaintiff clearly was aware and put on notice of the reimbursement obligation and the expenses involved in the preparation of the EIS. Finally, the EIS itself specifically detailed the necessary expenses.

Based upon this information, it is concluded that BLM's procedures in this particular case were sufficient to insure that the plaintiff was on notice as to what costs it was going to voluntarily incur and was treated fairly. Plaintiff's claim to recover the full amount of fees paid to Interior for the preparation of the EIS must be denied.

## B. Collateral Estoppel

The plaintiff next argues that the "defendant is collaterally estopped from asserting that preparation of an environmental impact statement confers a special benefit upon an identifiable recipient the costs of which are properly reimbursable." Plaintiff relies upon *Public Service Co. v. Andrus*, 433 F.Supp. 144 (D.Colo.1977), where the United States District Court for the District of Colorado concluded that environmental impact studies undertaken in conjunction with the processing of right-of-way applications do not provide special benefits to the applicant beyond those which accrue to members of the general public. *Id.* at 152. Because this issue was decided against the Government by the district court, and the Government did not appeal, plaintiff contends that the defendant cannot now argue the issue before this Court.

■ The doctrine of collateral estoppel provides: "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party [against whom the issue was resolved] to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Originally, the doctrine of mutuality required that both parties to the subsequent litigation must also have been parties to the initial suit. That doctrine has now eroded somewhat and the Supreme Court has granted courts discretion to permit the use of nonmutual offensive collateral estoppel. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *see also Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 808 (9th Cir.1980); *Monterey Life Systems, Inc. v. United States*, 225 Ct.Cl. 50, 61, 635 F.2d 821, 826–27 (1980).

■ However, the Supreme Court recently held that the doctrine of nonmutual collateral estoppel is limited to private parties and may not be asserted against the Government. In *United States v. Mendoza*, — U.S. —, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), the Court observed that the position of the Government in litigation is unlike that of a private party. Government litigation frequently involves issues of substantial public importance and the Government is more likely to find itself involved in lawsuits against different parties in multiple forums than is any private litigant. Such multi-forum litigation, the Court observed, permits exploration and development of difficult legal issues. The application of nonmutual offensive collateral estoppel against the Government "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *Id.* at 572. The Court held, therefore, that a litigant not a party to an earlier adjudication may not estop the Government from relitigating an issue determined in the earlier proceeding. *Id.* at 574.

Accordingly, the decision of the district court in *Public Service Co. v. Andrus* does not prevent the defendant from relitigating the issue of whether the costs of conducting an EIS are properly reimbursable. Nevertheless, even in the absence of the *Mendoza* decision, this Court would be constrained to reject plaintiff's collateral estoppel argument.

In *Commissioner v. Sunnen*, the Supreme Court observed that collateral estoppel "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally." 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1947). The Court noted, however, that collateral estoppel "is not meant to create vested rights in decisions that have become obsolete or erroneous with time * * *." *Id.* An intervening judicial pronouncement may change the legal atmosphere to such a degree as to render application of collateral estoppel inapplicable. *Id.; see also Western Oil & Gas Ass'n, supra*, 633 F.2d at 809. Significantly, courts following the dictum in *Commissioner v. Sunnen* have allowed federal agencies to relitigate substantially similar legal issues raised by different events, even following adverse deci-

sions elsewhere. *Western Oil & Gas Ass'n, supra,* 633 F.2d at 808.

In applying these principles to the present case, it is apparent that application of collateral estoppel in this case would be inappropriate. The legal atmosphere clearly has changed since the decision of the district court in *Public Service Co. v. Andrus.* Both the Fifth and Tenth Circuits have held that although the processing of an EIS confers some incidental benefit upon the public, the primary benefit flows to an identifiable private recipient, the right-of-way applicant. *See, e.g., Nevada Power Co. v. Watt,* 711 F.2d 913 (10th Cir.1983); *Alumet v. Andrus,* 607 F.2d 911 (10th Cir.1979); *Mississippi Power & Light Co. v. NRC,* 601 F.2d 223 (5th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980). This Court believes that the decisions of the Fifth and Tenth Circuits should not be ignored in favor of unswerving and rigid reliance upon the doctrine of collateral estoppel. *See Commissioner v. Sunnen, supra,* 333 U.S. at 599–600, 68 S.Ct. at 720. Defendant, therefore, is not collaterally estopped by the 1977 decision of the U.S. District Court in *Public Service Co. v. Andrus.*

### C. Exhaustion of Administrative Remedies

#### 1. *Claim II of Plaintiff's Complaint*

■ Count II of plaintiff's complaint asserts a claim to recover some $294,414.55 in indirect, or markup, costs that plaintiff paid the BLM. These markup costs, plaintiff contends, were improperly billed to plaintiff because they are attributable to ongoing middle-level management costs within the BLM.

In its cross-motion for summary judgment, defendant urges that the doctrine of exhaustion of administrative remedies bars plaintiff from asserting before this Court a claim for the markup costs. Defendant notes that plaintiff and the BLM bargained for an administrative remedy which established an appeal mechanism to be employed in connection with disputed costs. Although plaintiff raised the markup issue with the BLM State Director, it did not

appeal to the Secretary the State Director's denial of a portion of the markup claim. Because plaintiff failed to avail itself of the administrative remedy to which it had agreed, defendant argues, plaintiff may not now raise the claim before this Court.

Plaintiff counters that it should not be precluded from raising the markup cost issue *de novo* before this Court. Plaintiff does not contest the fact that it did not appeal the State Director's markup costs decision to the Secretary, but argues that such an appeal would have been a useless act. Plaintiff observes that although its appeal of the claim to the State Director resulted in a partial refund of some $170,-932.23, the refund was due to a department-wide policy change reducing the rate at which the markup costs were calculated. Accordingly, plaintiff argues, it would have been futile "[f]or plaintiff to appeal the decision on indirect costs to the body that had already made that decision * * *." Plaintiff also urges that its markup cost claim involves a purely legal question. No agency discretion is involved, no agency expertise is needed and the administrative process would not be thwarted if the Court allowed plaintiff to assert the claim *de novo.*

For the reasons discussed hereinafter, the Court concludes that plaintiff failed to exhaust its administrative remedies and may not now raise the markup issue *de novo.*

■ The doctrine of exhaustion of administrative remedies provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1968) (quoting *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938)). The doctrine is important because it prevents interruption of the administrative process, allows an agency to exercise its expertise in an area under its jurisdiction and permits the agency to develop a comprehen-

sive factual record. *McKart v. United States, supra,* 395 U.S. at 193–95, 89 S.Ct. at 1662–63. Moreover, when parties have outlined administrative remedies in an agreement, the court should allow those administrative steps to proceed without judicial interference. *The Len Co. & Assoc. v. United States,* 181 Ct.Cl. 29, 54, 385 F.2d 438 (1967).

As discussed previously, the parties in this case signed an Agreement which included provisions for administrative relief. Section G of the Agreement stated:

> (G) If, after auditing the Department, Applicant decides to dispute any item of any statement that has been rendered, Applicant shall give the Secretary or his representative written notice of each item that is disputed, accompanied by a detailed explanation of its objection. Within thirty (30) days after notice of a disputed item or after notice of the completion of the audit, as the case may be, the Secretary or his representative and Applicant shall meet to discuss, and attempt to resolve, all items which are disputed or which have not been resolved by the audit. If at that time they are unable to resolve all such items, Applicant may appeal any unresolved items to the Secretary. Any decision of the Secretary, with respect to any such appeal, shall constitute the final administrative decision of the Department. Any item that Applicant successfully disputes or appeals shall be refunded to the Applicant. In addition, if the audit discloses that the Applicant has overpaid the Department, all overpayments shall be promptly refunded to the Applicant.

Pursuant to this section, the plaintiff disputed charges assessed to it by the BLM.

On December 31, 1979, the plaintiff filed a notice of dispute with the California State Director of the BLM. The plaintiff presented two claims for relief:

> Items I and II, set forth below, are alternative claims for refund. Item I contains all the costs allegedly incurred by BLM in connection with the environmental impact statement prepared prior to the issuance of the right-of-way grant in CA 3242. If BLM determines that the amount set forth in Item I should be refunded to SOHIO it need not consider the items set forth in Item II. * * * If BLM were to decide * * * that all EIS costs, as such, were properly reimbursable by SOHIO, BLM then needs to address specifically the individual items set forth in II.

Claim II was for "[i]tems incorrectly billed by BLM and paid by SOHIO Transportation Company: $681,433.96."

On February 26, 1981, the Director denied Claim I, but allowed certain costs under Claim II. On March 27, 1981, the plaintiff appealed Claim I to the Secretary of the Interior as mandated by the Agreement. The plaintiff did not appeal the decision rendered on Claim II. On January 13, 1982, the Acting Secretary of the Interior affirmed the Director's decision on Claim I.

Thereafter, on March 12, 1982, plaintiff filed its petition in this Court presenting two claims for relief. Claim I again challenged the authority of the Department of the Interior to seek reimbursement of costs incurred in the preparation of the EIS. In the alternative, Claim II involved indirect or markup costs that allegedly were billed incorrectly by the BLM.

The plaintiff failed to follow the appropriate administrative remedies, as outlined in the Agreement, regarding Claim II. That claim was brought before the Director, who rendered a decision on the subject, allowing the plaintiff a partial refund. If the plaintiff disputed that finding, it should have followed the next administrative step in the appeal process, as it did with Claim I, and appealed to the Secretary of the Interior. Plaintiff did not properly appeal Claim II to the Secretary of the Interior as required by the Agreement. The plaintiff, therefore, did not exhaust the proper administrative remedies for Claim II. Because the plaintiff failed to exhaust its administrative remedies before coming

to this Court, the matter is premature and thus will be dismissed.

Plaintiff argues that it would have been futile to appeal its indirect cost claim to the Secretary, citing *Bendure v. United States*, 554 F.2d 427, 213 Ct.Cl. 633, 641 (1977). This Court disagrees that an appeal to the Secretary on the markup cost issue would have been a "useless motion." Rather, the Secretary of the Interior was in a position to correct any errors made by the Director, and an agency should be given "an opportunity to correct its own mistakes." *FTC v. Standard Oil of California*, 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980). The Secretary of the Interior was clearly in a better position to examine the markup issue fully and reach a decision. Thus, the plaintiff should have followed the steps outlined in the Agreement and exhausted its administrative remedies on the Claim II markup costs before seeking judicial review in this Court.

### 2. *Plaintiff's "Third Claim" for Excessive Costs*

■ Plaintiff appears to be asserting a claim that certain costs associated with the BLM's preparation of the EIS were excessive. The first indication to this Court that plaintiff believed that it had a claim for a refund due to excessive charges was a footnote to Plaintiff's Brief in Opposition to Defendant's Cross-Motion for Summary Judgment. Footnote 6 states:

> Defendant's cross-motion for summary judgment ignores that even if EIS costs were properly reimbursable, the EIS costs in this case were excessive because the EIS covered the transportation of oil from Alaska to Texas not just California to Texas as proposed by SOHIO. See Plaintiff's Answer to Defendant's Interrogatory No. 1. The extent to which the costs were excessive would have to be tried.

Subsequently, at oral argument, on August 26, 1983, counsel asserted that plaintiff's suit involved three claims, two of which are the subject of the present motion for summary judgment. Additionally, counsel contended that if plaintiff's motion is not granted, "there would remain at trial the issue of whether the environmental impact statement was excessive and hence gave rise to excessive costs, and whether as a substantive matter the fee reflected the value to the recipient." Transcript of Proceedings at 37. This Court is at a loss to locate where in the complaint plaintiff's excessive cost claim lies. The complaint sets forth, at pages 6 and 7, two claims, the first seeking judgment in the amount of $2,494,766.70, the second seeking a refund of $294,414.55 for costs which allegedly represent ongoing management costs of the BLM, *i.e.*, the so-called "markup" costs.

Plaintiff's failure to raise its excessive cost "claim" in a timely fashion is fatal. Well over a year passed between the March 12, 1982 filing of the complaint and oral argument on August 26, 1983. On February 28, 1983, plaintiff filed its Brief in Opposition to Defendant's Cross-Motion for Summary Judgment. It was in this brief that plaintiff first raised the excessive cost issue. Despite plaintiff's apparent belief in February of 1983 that it had a potential claim for refund of excessive costs, plaintiff failed to amend its complaint to reflect this alternate theory of recovery. Accordingly, any claim which plaintiff may have for a refund of processing costs on the grounds of excessiveness is not properly before this Court and will not be addressed.

In any event, this Court would be constrained to reject plaintiff's claim, even if it had been raised in a timely fashion. As was noted previously, plaintiff and the BLM bargained for an administrative remedy which established procedures to be utilized in connection with disputed costs. The Agreement established an appeals process whereby plaintiff was first required to raise any disputed costs before the BLM State Director. In the event the State Director issued an adverse decision, plaintiff then had available an avenue of appeal to the Secretary of the Interior. Plaintiff did,

in fact, invoke the procedures set forth in the Agreement to dispute both the propriety of BLM's entire cost reimbursement scheme and the authority of BLM to assess indirect markup costs. At no time, however, did plaintiff raise the issue of excessive costs before the BLM State Director. Nor did plaintiff appeal the issue to the Secretary. Thus, plaintiff utterly failed to exhaust the administrative remedies to which it had agreed. At best, plaintiff's "claim" of excessive costs is an afterthought, and it cannot, and will not, be addressed by this Court.

### D. Summary

In summary, the charges that the BLM assessed to plaintiff were not unconstitutional taxes. Rather, they were permissible fees charged by the agency to recoup the actual costs, both direct and indirect, of conferring a special benefit upon an identifiable beneficiary. Likewise, the district court's decision in *Public Service Co. v. Andrus* does not estop the defendant from relitigating the issue of whether EIS preparation confers a special benefit upon an identifiable recipient. In addition, Interior's cost-reimbursement regulations are not contrary to or in excess of the authority delegated to the agency by Congress in the IOAA and the MLA, and the regulations were sufficient to place plaintiff on notice regarding the charges which BLM would assess in connection with processing plaintiff's right-of-way application. With regard to plaintiff's Claim II for refund of markup costs and its asserted Claim III for refund of excessive costs, the Court holds that plaintiff failed to exhaust mandatory administrative remedies and thus may not now seek to litigate those claims for the first time in this Court.

### CONCLUSION

For the foregoing reasons, the defendant's cross-motion for summary judgment is granted, the plaintiff's motion for summary judgment is denied, and the complaint is to be dismissed.